[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 14, 2003
THOMAS K. KAHN
CLERK

_____

No. 01-13961
Non-Argument Calendar

_____

D. C. Docket No. 00-00320-CR-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RAUL ANTHONY ORTIZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(January 14, 2003)**

Before BLACK, HULL and MARCUS, Circuit Judges.

PER CURIAM:

Defendant-Appellant Raul Anthony Ortiz ("Ortiz") appeals his firearms-related convictions and 33-month sentence. Ortiz challenges the sufficiency of the evidence as to seven of his nine firearms-related convictions and makes an Apprendi challenge to his sentence. After review, we affirm as to Ortiz's convictions and sentence.

## I. INDICTMENT

A nine-count indictment charged Ortiz with (1) making false statements to a federally licensed firearms dealer, in violation of 18 U.S.C. § 922(a)(6) (Counts 1 through 7); (2) dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A) (Count 8); and (3) transporting firearms in interstate commerce with intent to engage in dealing in firearms without a license, in violation of 18 U.S.C. § 924(b) (Count 9). The jury convicted Ortiz on all nine counts.

On appeal, Ortiz does not challenge his convictions in counts 8 and 9. Instead, Ortiz challenges only his convictions under counts 1 through 7. As to those seven counts, Ortiz argues that the government did not prove beyond a reasonable doubt that he made false statements to a federal firearms dealer. Thus, we outline in detail the trial evidence as to those seven counts.

## II.  TRIAL EVIDENCE

### A.  Ortiz Purchased Seventeen Guns

At the time of his offenses, Ortiz was a private in the U.S. Army, stationed at Fort Stewart, Georgia.  Ortiz legally could purchase firearms in the State of Georgia for himself.  Ortiz made a total of seven sales transactions with two pawn shops in Hinesville, Georgia, resulting in his aggregate purchase of seventeen pistols.  Prior to each purchase, he completed an ATF Form 4473, answering "yes" to question 9a: "Are you the actual buyer of the firearm indicated on this form?"  The question continues: "[i]f you answer 'no' to this question the dealer cannot transfer the firearm to you.  *(See Important Notice 1.)*"  Important Notice 1 warns that "[a]ny individual who is not buying the firearm for himself or herself or as a gift, but who completes the form, violates the law."

On the following dates, Ortiz purchased the listed firearms and completed ATF Forms 4473, as described above, which forms were kept on file at the relevant pawn shop:

### Mr. Cash Pawnshop

August 1, 2000:    Intratec, model AB-10, 9 MM pistol, SN A051098

August 23, 2000:  Hi-Point, model C9MM, 9MM pistol, SN P065627

October 3, 2000:  Hi-Point, model C9MM, 9MM pistol, SN P065541
                        Hi-Point, model CF380, .380 caliber pistol, SN P741351

                    Hi-Point, model CF380, .380 caliber pistol, SN P741305

October 13, 2000:  Hi-Point, model CF380, .380 caliber pistol, SN P741355
                    Hi-Point, model CF380, .380 caliber pistol, SN P741306
                    Hi-Point, model JC40, .40 caliber pistol, SN 112014
                    Hi-Point, model JC40, .40 caliber pistol, SN 112013

Super Pawn

July 28, 2000:     Lorcin, model L380, .380 caliber pistol, SN 445386
                    Lorcin, model L380, .380 caliber pistol, SN 552608

October 3, 2000:   Jennings, model Jennings Nine, 9 MM pistol, SN
                    13046098
                    Intratec, model AB-10, 9MM pistol, SN A054690

October 13, 2000:  Lorcin, model L380, .380 caliber pistol, SN 549756
                    Lorcin, model L380, .380 caliber pistol, SN 556690
                    Lorcin, model L380, .380 caliber pistol, SN 556693
                    Lorcin, model L380, .380 caliber pistol, SN 556691

When an unlicensed person purchases two or more pistols and/or revolvers within a five-business day period, the licensed firearms dealer (a) must complete an ATF Form 3310.4 with information about the purchaser and the firearms sold and (b) submit it to the National Tracing Center and State or local authorities, as provided on the form.

Upon receiving the ATF Forms 3310.4 reporting multiple guns sales to Ortiz, the Bureau of Alcohol, Tobacco and Firearms ("ATF") had suspicions as to whether Ortiz was reselling the firearms due to the large quantity of pistols purchased, the purchase of multiples of the same model of pistol, and the fact that

4

the pistol models purchased were low cost. (The ATF indicated that low cost guns are often sold at a much higher cost and thus allow for a greater profit upon resale.) In addition, Georgia is considered a "source area" due to the ease with which handguns may be purchased. Because Ortiz was an army soldier, the ATF notified Fort Stewart about its suspicions and requested assistance. The U.S. Army Criminal Investigation Division ("CID") informed the ATF that Ortiz had not registered any firearms, despite a requirement that soldiers who reside on post are required to register any weapons in their possession. The CID obtained a search warrant from a military magistrate.

On November 14, 2000, CID Agent Hickey and ATF Special Agent Louis Valoze conducted a warrant-based search of Ortiz's quarters and found no firearms. The search produced sales receipts, one dated August 23, 2000, and three dated October 13, 2000, from the pawnshops for gun purchases, for full metal jacket purchases and for bus and plane transportation between Savannah and New York City.[1]

---

[1]Specifically, they found four documents relating to one-way AirTran Airways travel from New York City to Savannah in the name of Raul Ortiz for 29 August (receipt), 30 August (receipt and boarding passes), 1 October (boarding passes) and 15 October (receipt and boarding passes); one one-way Delta Air Lines ticket in Ortiz's name for travel from New York City to Savannah on 9 October (ticket and boarding pass); and one Greyhound bus receipt in Ortiz's name on 13 and 14 October for overnight travel from Savannah to New York City.

B.  Ortiz's Signed Statement

On November 21, 2000, CID Agents Hickey and Miller met Ortiz at Hunter

Army Airfield, Georgia, upon his return from military training in California.  ATF

Agents Valoze and John Limbach also were present at the airport.  The agents did

not arrest Ortiz at that time, but did interview him—first at the CID office and then

at the ATF field office.  The agents advised Ortiz of his <u>Miranda</u> rights.[2]  Ortiz read

and signed waivers of his rights to counsel and to remain silent, and agreed to

speak with the agents.

At the CID office, Ortiz stated that he had transported the seventeen firearms

to New York City.  During his interview at the ATF office, Ortiz agreed to make a

written statement, which he asked Agent Valoze to write for him, about his alleged

firearms-related activity.[3]  After Agent Valoze completed the statement on Ortiz's

behalf, Ortiz read it and signed each page of his statement.  Ortiz made no changes

or corrections to the statement dictated to Agent Valoze.  Above the signature

block where he signed, Ortiz verified that his statement was true and correct as

follows:

---

[2]<u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1996).

[3]According to Agent Valoze's testimony, Ortiz asked Agent Valoze to write the statement because Ortiz was nervous and did not want to write the statement.

6

I have read the foregoing statement consisting of ____ pages, each of which I have signed. I fully understand this statement and I declare, certify, verify and/or state under penalty of perjury that the foregoing is true and correct. I made the corrections shown and placed my initials opposite each. I made this statement freely and voluntarily without any threats or rewards, or promises of reward having been made to me in return for it.

ATF Form 5000.[4]

The government introduced Ortiz's signed statement into evidence at trial. According to his statement, Ortiz traveled to New York City and sold four guns to Richard Alexander Rivera ("Rivera" or "Alex Rivera"), whom he knew from when he lived in New York, for about $900.[5] He then made a second trip to New York City and sold five guns to Martin Jenkins ("Jenkins" or "Marty Jenkins") for about $900. On a third trip, Ortiz again traveled to New York City and sold eight guns to Rivera for about $1300.[6] Ortiz resold seventeen guns, the same number of guns he

---

[4]Below Ortiz's signature, his statement contains this jurat, completed by Agent Valoze: "Subscribed and sworn to before me this 21 day of November, []2000 at Savannah. Signature: [Louis Valoze]. Title: Special Agent, ATF." ATF Form 5000. Ortiz, however, was not asked to and did not actually swear orally before Agent Valoze to the statement and its content. Instead, Agent Valoze as a matter of course completed this section with the date of the interview and his own signature and information.

[5]Ortiz was born in 1977 and raised in Bronx, New York.

[6]Rivera testified that he paid Ortiz (a) $2300 for the first batch of four guns, plus some ammunition and a bullet proof vest, (b) $100 to swap two older model guns previously purchased from Ortiz for newer models from the second batch Ortiz brought to New York City to sell to a different purchaser, and (c) $2100 for

7

had purchased in Georgia, to the two buyers in New York City. Because they are not Georgia residents, neither Rivera nor Jenkins could legally purchase firearms in Georgia.

Ortiz's statement indicated that "[b]efore I purchased any of these firearms, an individual named Alex Rivera, a friend of my sister, Elisha Ortiz, had asked me if I could buy guns for him in Georgia" (emphasis added). In his statement,[7] Ortiz described each of his three trips to New York City. Regarding the first trip, Ortiz stated that he traveled to New York City by Greyhound bus with the first four guns, which he took to his fiancee's house. She objected to having the guns there, so Ortiz "called Alex Rivera … and offered to sell him the guns." He then returned to Hinesville, Georgia. Using some of the proceeds from his previous sale, Ortiz purchased five more guns in Hinesville. As to this second purchase for Rivera, Ortiz's statement also indicated: "Rivera had asked me to purchase more firearms and that he would buy them from me."

---

the second batch of four guns, for a total of three transactions with Ortiz. This account varies from Ortiz's statement, which gives different sales prices for the guns sold to Rivera and describes the two sales transactions with Rivera, but omits the swap.

[7]Ortiz and Jenkins did not testify at trial.

About one week later, Ortiz made his second trip. He returned to New York City by bus and brought the five guns he purchased in Hinesville to his sister's house. His sister provided him with the name of Marty Jenkins, a friend of hers, as a potential buyer. Ortiz contacted Jenkins. Jenkins came to Ortiz's sister's house, paid cash and picked up the guns. Ortiz flew back to Georgia.

On his third trip to New York City, Ortiz brought eight guns by Greyhound bus. Ortiz stated that he "called Alex Rivera from the bus station in New York and told him that I had the guns and told him to meet me at my sister's house." According to Ortiz's statement, Rivera met Ortiz at his sister's house and gave Ortiz about $1300 for the guns.

While being interviewed on November 21, 2000, Ortiz agreed to telephone Rivera and Jenkins. Ortiz made a total of five telephone calls, two of which were unsuccessful attempts to reach Jenkins. Each call was made in the presence of Agent Valoze and recorded by the ATF via microcassette recorder. The recorded calls indicated that Rivera and Jenkins had purchased guns from Ortiz. Arrest warrants were obtained for Rivera and Jenkins and were executed by the ATF in New York City on November 30, 2000.

At the time the arrest warrant was served, Rivera consented to a search of his home. Among other things, four guns were recovered at Rivera's home, and the

serial numbers on three of them had been obliterated. The guns were identified as four of those originally purchased by Ortiz. Although three had no serial number remaining, the guns were found with their boxes, and each box listed the serial number of the corresponding gun.

## C. Rivera's Testimony

Rivera's testimony at trial confirmed that he purchased the weapons at issue from Ortiz.[8] Rivera's testimony, however, diverged somewhat from Ortiz's as to who initiated the purchases and as to the gun resale prices in some instances. Although Ortiz's statement indicated Rivera initiated the purchases and asked Ortiz to buy the guns, Rivera testified that he did not arrange in advance to purchase guns from Ortiz prior to Ortiz's purchase of the guns at Super Pawn and Mr. Cash.

According to Rivera, on each occasion Ortiz was already in possession of the guns when he contacted Rivera to inquire whether he was interested in purchasing them. Rivera further testified that Ortiz had a different buyer lined up for the first batch of guns but that the deal fell through and then Rivera bought them. Rivera contends that he later paid $100 to swap two previously purchased guns with two in the second group Ortiz brought to New York City. Rivera also

---

[8]Rivera testified that he had pled guilty to conspiring to purchase and sell firearms as well as to two other firearms charges.

testified that he bought the third batch of guns from Ortiz only after Ortiz was extremely persistent in asking Rivera to purchase them.

Additionally, Rivera stated that Ortiz was the person who had obliterated the serial numbers on three of the four guns found in Rivera's home. Rivera explained that Ortiz did not deface the fourth gun because Ortiz ran out of time before leaving for military training in California.

Finally, Rivera further testified as follows: that he lives in Bronx, New York, and always has worked "off-the-books" (for cash and without reporting his income) with the exception of one job with a toy store; that he smoked marijuana from age 18 to the date of his arrest by the ATF in connection with this case; and that he was involved for approximately eight years in delivering stolen cars to designated destinations. Rivera never was arrested for his involvement with the stolen cars.

A jury convicted Ortiz on all nine counts. The district court sentenced Ortiz to terms of 33 months imprisonment on each count, to run concurrently. Ortiz timely appealed.

### III. STANDARD OF REVIEW

With respect to Ortiz's convictions, we review de novo whether there is sufficient evidence to support the jury's verdict. A jury's verdict will be affirmed

11

"if a reasonable trier of fact could conclude that the evidence establishes guilt beyond a reasonable doubt." United States v. Miles, 290 F.3d 1341, 1355 (11th Cir. 2002). We view the evidence "in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor" in determining a sufficiency of the evidence claim. Id.

With respect to Ortiz's sentence, "[w]e review the district court's application of the Sentencing Guidelines de novo and its findings of fact for clear error." United States v. Smith, 231 F.3d 800, 806 (11th Cir. 2000) (quoting 18 U.S.C. § 3742, which provides that "[t]he court of appeals … shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts.").[9]

## IV. DISCUSSION

### A. 18 U.S.C. § 922(a)(6)

In counts 1 through 7, Ortiz was convicted of violating 18 U.S.C. § 922(a)(6), which provides in relevant part:

> it shall be unlawful … for any person in connection with the
> acquisition … of any firearm … from a … licensed dealer …
> knowingly to make any false or fictitious oral or written statement or
> to furnish or exhibit any false, fictitious, or misrepresented
> identification, intended or likely to deceive such … dealer … with

---

[9]Smith references §3742(d) but this language is actually in §3742(e).

12

> respect to any fact material to the lawfulness of the sale or other disposition of such firearm.

18 U.S.C. § 922(a)(6). To sustain a conviction under § 922(a)(6), the government must prove beyond a reasonable doubt that: (1) the defendant knowingly made; (2) a false or fictitious written statement in connection with the purchase of firearms; (3) intended to deceive or likely to deceive a licensed firearms dealer; (4) and the false statement was a fact material to the lawfulness of the sale or disposition of the firearm. Id.; see United States v. Nelson, 221 F.3d 1206, 1210 n.6 (11th Cir.), cert. denied, 531 U.S. 951 (2000); United States v. Polk, 118 F.3d 286, 294-95 (5th Cir. 1997).[10] The identity of the actual purchaser is clearly "a fact material to the lawfulness of the sale" of a firearm under 18 U.S.C. § 922(a)(6). See United States v. Klais, 68 F.3d 1282, 1283 (11th Cir. 1995).[11] Thus, a defendant violates § 922(a)(6) when the defendant signs the ATF form using a false name because that misrepresents the identity of the purchaser. United States v. Gonzales, 71 F.3d 819, 833 (11th Cir. 1996).

---

[10]In addition, specific intent is not an element of the offense. United States v. Hawkins, 794 F.2d 589, 591 (11th Cir. 1986). In this regard, "specific intent" means "[t]he intent to accomplish the precise criminal act that one is later charged with." Black's Law Dictionary 814 (Deluxe 7th ed. 1999).

[11]"Whether the identity of the purchaser is a fact material to the lawfulness of the transaction (that is, whether the lawfulness of a firearms sale can hinge on the identity of the purchaser) is purely a question of law." Klais at 1283.

13

This Court also has made it clear that "straw purchases" equally misrepresent the identity of the purchaser in a firearm sale and violate 18 U.S.C. § 922(a)(6).  See Nelson at 1210.  Straw purchases of firearms occur when an unlawful purchaser, such as Rivera, uses a lawful "straw man" purchaser, such as Ortiz, to obtain a firearm.  See Nelson at 1209.[12]  "If an ineligible buyer could simply use a 'straw man' or agent to obtain a firearm from a licensed dealer, the statutory scheme would be too easily defeated."[13]  Id.  In Nelson, the two ineligible buyers actually supplied the money for the firearms and recruited and paid Georgia residents to purchase the firearms.

In contrast to Nelson, Ortiz points out that he used his own money to purchase the firearms and that Rivera testified that he never requested Ortiz to make purchases on his behalf.  Ortiz's argument lacks merit for two reasons.  First,

---

[12]Although the defendant in Nelson was convicted under 18 U.S.C. § 924(a)(1)(A), this Court recognized that the reasoning of § 922(a)(6) "provides guidance … because of the similarities between the two provisions."  Nelson, 221 F.3d at 1210 n.6.

[13]Other courts have likewise held that "straw purchases" or similar sham transactions violate 18 U.S.C. § 922(a)(6).  See United States v. Lawrence, 680 F.2d 1126, 1128 (6th Cir. 1982) ("Other courts have upheld convictions for gun registration violations predicated on sham transactions and we must do so here."); United States v. Sargent, 98 F.3d 325, 327 (7th Cir. 1996) (gang member makes straw purchases of firearms for gang in exchange for "money, protection, and status"); United States v. Remsza, 77 F.3d 1039 (7th Cir. 1996) (defendant acts as "straw purchaser" for out-of-state resident).

14

the evidence was more than sufficient for a reasonable jury to conclude beyond a reasonable doubt that Rivera had in fact asked Ortiz to purchase firearms for him and that Ortiz, therefore, was a straw purchaser for Rivera and not the actual buyer.[14]  In his own signed statement, Ortiz expressly admitted that Rivera made two requests for Ortiz to purchase guns for him before Ortiz actually purchased the guns, which he then promptly delivered to Rivera.  Thus, an agency relationship clearly is established with respect to the sales transactions involving Rivera.[15]

Second, there is no requirement that the ineligible purchaser must supply the money up front in order for a straw purchase to occur.  Here, there was evidence that Rivera had asked Ortiz to buy firearms; Ortiz then bought the firearms for Rivera, promptly delivered them to Rivera and was paid by Rivera.  We conclude that the evidence sufficiently showed that Ortiz purchased the guns for Rivera, an

---

[14]See United States v. Chastain, 198 F.3d 1338, 1351 (11th Cir. 1999) (holding that the jury has "exclusive province" over the determination as to the credibility of a witness, and this Court may not revisit this question), cert. denied, 532 U.S. 996 (2001); see also United States v. Shenberg, 89 F.3d 1461, 1470 (11th Cir. 1996) (holding that if a reasonable person could find that the evidence establishes guilt beyond a reasonable doubt, the jury's verdict must stand).

[15]We recognize that Rivera testified otherwise, but conclude that, in light of Rivera's background, the jury properly could have discredited Rivera's testimony and believed the direct evidence of Ortiz's own admissions indicating that Rivera asked Ortiz to buy the guns for him prior to Ortiz's purchases.

15

ineligible buyer, that Ortiz was not buying the guns for himself or as a gift, and that Ortiz misrepresented that he was the "actual buyer" on ATF Form 4473.

Indeed, ATF Form 4473 specifically asks in question 9a: "Are you the actual buyer of the firearm indicated on this form?" And, Important Notice 1 explains: "Any individual who is not buying the firearm for himself or herself or as a gift, but who completes the form, violates the law." Ortiz expressly was put on notice that he is the "actual buyer" only if the purchase of firearms is for himself or for a gift and, thus, as to what constitutes a violation of the law. Thus, a straw transaction occurred here because Ortiz at the time of completing Form 4473 had no intention of keeping the firearms or giving them as a gift and instead was buying the firearms for Rivera, an ineligible purchaser who then paid for and took delivery of the firearms. In this circumstance, Ortiz misrepresents that he is the "actual buyer."[16]

Sufficient evidence also supports Ortiz's conviction on all counts involving the guns that he delivered to Jenkins. While there is no direct evidence that Jenkins asked Ortiz to purchase the guns before Ortiz actually bought them, there

---

[16]Because both Rivera and Jenkins were ineligible buyers, we do not address the situation where both the ultimate buyer and the "straw purchaser" are lawfully eligible to purchase firearms. See, e.g., United States v. Polk, 118 F.3d 286 (5th Cir. 1997).

is overwhelming circumstantial evidence that, at the time of the purchases in Georgia, Ortiz equally was not buying the guns sold to Jenkins for himself or as a gift to another, but specifically was purchasing the guns for the sole purpose of immediately delivering and selling them to an ineligible buyer in New York City, whether the buyer is Rivera or Jenkins. In this factual circumstance, Ortiz may not necessarily be a straw man for Jenkins, but Ortiz is no less involved in a sham transaction and misrepresenting that he is the "actual buyer" of the firearms when he answers "yes" to question 9a on ATF Form 4473.

Indeed, it is undisputed that neither Rivera nor Jenkins legally could purchase firearms in Georgia. Ortiz purchased all seventeen guns in Georgia in an approximately eleven-week period between July 28, 2000, and October 13, 2000, and by the time of his November 21, 2000, interview all the guns were delivered to Rivera and Jenkins in New York City, and Ortiz was paid. In fact, Ortiz used the proceeds from the first sale to Rivera to buy more guns to deliver to ineligible buyers in New York City. The types of guns purchased by Ortiz were of low cost and commonly are resold for profit. Ortiz purchased multiples of the same model of gun. None of the seventeen guns were registered with Fort Stewart authorities. Georgia is considered a "source area" due to the ease with which handguns may be

17

purchased, whereas the legal purchase of handguns in New York is extremely restricted.

Given all the factual circumstances in this case, we conclude that the evidence was also sufficient to sustain Ortiz's conviction under 18 U.S.C. § 922(a)(6) as to the guns in the Jenkins transaction. As already mentioned, ATF Form 4473 specifically asks in question 9a: "Are you the actual buyer of the firearm indicated on this form?" The question is not merely "are you the buyer of the firearm," but "are you the <u>actual</u> buyer of the firearm." The essence of the information sought by this question is further clarified by Important Notice 1, which warns "[a]ny individual who is not buying the firearm for himself or herself or as a gift, but who completes the form, violates the law." This is precisely what Ortiz did.

B. Sentence

As to his sentence, Ortiz contends that the district court erred in finding that he obliterated the serial numbers on certain guns and in imposing a 2-level increase to his offense level based on this fact finding. Ortiz contends that this fact should have been submitted to and decided by a jury under <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000). The Sentencing Guidelines provide for a 2-level enhancement "[i]f any firearm was stolen, or had an altered or obliterated serial number."

18

U.S.S.G. § 2K2.1(b)(4).  The evidence amply supported the district court's finding that Ortiz obliterated the serial numbers, and the district court properly imposed this 2-level enhancement under U.S.S.G. § 2K2.1(b)(4).

Ortiz also makes several Apprendi-based arguments attacking the district court's sentence, but none has merit.  First, in Apprendi, the Supreme Court held that "any fact [other than a prior conviction] that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Apprendi, 530 U.S. at 490.  Ortiz's concurrent terms of 33 months' imprisonment on each count of conviction do not exceed the statutory maximum penalty of 10 years for each of his § 922(a)(6) convictions. See 18 U.S.C. § 924(a)(2); United States v. Le, 256 F.3d 1229, 1240 (11th Cir. 2001), cert. denied, 534 U.S. 1135 (2002); United States v. Smith, 240 F.3d 927, 930 (11th Cir. 2001).  Thus, his sentence does not violate Apprendi.

Second, this Court has held that Apprendi does not apply to calculations under the Sentencing Guidelines.  See United States v. Snyder, 291 F.3d 1291, 1294 n.3 (11th Cir. 2002); United States v. Rodriguez, 279 F.3d 947, 950 n.2 (11th Cir. 2002); United States v. Le, at 1240.  Thus, the district court's fact finding under the Sentencing Guidelines about who obliterated the serial numbers does not violate Apprendi.

19

## V.  CONCLUSION

For the forgoing reasons, we affirm Ortiz's convictions and sentence.

AFFIRMED.