[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-10513

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 22, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-00162-CR-T-27-MSS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROBERT CURTIS COVINGTON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 22, 2009)

Before CARNES, HULL and COX, Circuit Judges.

CARNES, Circuit Judge:

Robert Covington appeals his sentence and convictions under 18 U.S.C. § 1958 for using an interstate facility with the intent that a murder for hire occur. He raises six issues: three challenges to his convictions based on the admissibility and sufficiency of the evidence against him and three challenges to his sentence based on the applicability of the Armed Career Criminal Act, 18 U.S.C. § 924(e), the grouping of his convictions under the sentencing guidelines, and the reasonableness of his consecutive sentences.

## I.

In October 2005 Covington beat up his girlfriend Kristy Cotto and threatened her with a gun. After a neighbor called 911, Covington was arrested. Because of his prior record, he expected a stiff sentence for the assault and gun possession. From jail, Covington called Cotto repeatedly and wrote her at least one letter urging her not testify against him.

After he was released from jail on bond, Covington sought to have Cotto killed. He contacted his friends Pumpkin and Wes (a married couple) in West Virginia about having Cotto murdered. Covington sent $300 and some cocaine to Wes as a down payment for the job. Wes called Stan, a drug dealer from Virginia, to sub-contract the hit. Stan enlisted the help of his acquaintance Towner, who he knew had been involved with drugs. Stan repeatedly solicited Towner to do a

2

"job" for him that would pay $5,000. Once Towner learned that the job was not a drug run, as he had expected, but instead a murder, he contacted the FBI. Under the FBI's guidance, Towner began recording his phone conversations with Stan and later his conversations with Covington.

During recorded conversations, Covington and Towner discussed various amounts of cocaine as payment for the murder. They also discussed details of the crime, including Covington's desire that Cotto be shot in the head, his opinion that a small-caliber gun was preferable, and his belief that after the murder Towner could escape while Covington was jailed as a suspect. After Towner requested money for his travel to Florida, Covington got Pumpkin to pass along the $300 Covington had earlier sent to Wes.

In March 2006 Towner traveled to Florida and, along with an undercover sheriff's deputy, met with Covington. At the meeting Covington drew them a map to Cotto's house and stated that he hoped to escape the charges pending against him once she was dead. He also suggested, that they enter her house by telling Cotto that they were police officers. After the meeting Covington was arrested. Confronted with tape recordings of himself, Covington confessed to police, admitting that he had contacted Wes and Stan about having Cotto killed and that he had sent $300 and a half-kilo of cocaine to Wes as a down payment.

3

Covington was indicted on three counts: Counts 1 and 2 for conspiracy and using interstate facilities with the intent that a murder for hire occur, both in violation of 18 U.S.C. § 1958,  and Count 3 for being a felon in possession of a firearm, in violation of  18 U.S.C. § 922(g).  Count 3 also alleged that Covington had three prior predicate offenses, which were specified, and for that reason was subject to the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1). Covington pleaded guilty to Count 3 and was convicted by a jury on Counts 1 and 2.  The district court sentenced Covington to 120 months on each of Counts 1 and 2 to run concurrently and to 360 months on Count 3 to run consecutively, for a total sentence of 480 months.   He appeals his convictions and sentences.

## II.

## A.

First, Covington contends that the district court abused its discretion and violated Federal Rules of Evidence 404(b) and 403 when it admitted three pieces of evidence  on the murder for hire charges:  (1) Cotto's testimony describing how Covington beat her during the incident in October 2005;  (2) the handgun that Covington threatened her with during that incident; and (3) recorded phone calls and letters between Covington and Cotto, made while he was in jail, discussing the beating.

4

Before trial, Covington pleaded guilty to Count 3, the felon in possession of a firearm charge.[1]   At trial the remaining counts were conspiracy and the use of an interstate facility with the intent that a murder for hire occur under 18 U.S.C. § 1958.  The government aimed to prove that Covington had arranged to pay for the murder of his ex-girlfriend Kristy Cotto.  The motive for Covington's crime, according to the government, was that Covington wanted to keep Cotto from testifying against him in a domestic violence case.  The district court admitted the gun, the jail communications, and Cotto's testimony about the assault, but it provided a limiting instruction to the jury.  Evidentiary rulings are reviewed only for a "clear abuse of discretion."  United States v. Veltmann, 6 F.3d 1483, 1491 (11th Cir. 1993).

Rule 404(b) prohibits the introduction of pure propensity evidence.  The rule states:  "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident

---

[1]  Covington's handwritten motion asking the judge to allow him to plead guilty expressed hope that his guilty plea to the possession charge would make his gun possession and his domestic assault on Cotto irrelevant and lead to the exclusion of any evidence about them from his trial on the other § 1958 charges.

. . . ." Under Rule 404(b), evidence that "[1] concerns the context, motive, and set-up of the crime and is linked in time and circumstances with the charged crime, or [2] forms an integral and natural part of an account of the crime, or [3] is necessary to complete the story of the crime for the jury" is admissible. United States v. Smith, 122 F.3d 1355, 1359 (11th Cir. 1997).

In deciding to admit the government's proffered evidence, the district court ruled that the jail correspondence was an "integral and natural part of an account" of the offense. See Smith, 122 F.3d at 1359. As for the gun and Cotto's testimony about the assault, the district court found that they were also admissible under Rule 404(b) as evidence of Covington's intent and motive for the murder for hire scheme. See Fed. R. Evid. 404(b).

Covington contends that the district court abused its discretion in finding the jail correspondence, Cotto's testimony, and the gun admissible. He argues that it was improper propensity evidence—a way for the government to portray him as a desperate, conniving, and violent man who was generally the sort of thug who might arrange a murder for hire.

It is clear, however, that the jail communications were "necessary to complete the story of the crime," Smith, 122 F.3d at 1359, and they also prove motive. The letters and phone calls show that Covington fully realized that

6

Cotto's testimony against him would likely lead to a long prison sentence. They also show that Covington desperately wanted Cotto not to testify, but he could not assure himself that she would not and so had reason to want her dead.

The gun and Cotto's testimony about it and the assault were also "integral and natural part[s] of an account of the crime" under Smith, 122 F.3d at 1359. The trial was about a murder for hire. The motive was to silence the testimony of Cotto against Covington. The trouble Covington was in if Cotto did testify is an important part of the story about this crime. It was the motive and motive is an integral part of any crime. As for admission of the handgun with which Covington had threatened Cotto during or soon after the assault, the use of it is part of the reason Covington had to believe that he faced a long prison sentence if Cotto lived to testify.

Covington also argues that, even if the jail communications, Cotto's testimony, and the handgun were admissible under Rule 404(b), they should have been excluded under Rule 403 because their probative value was "substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. Obviously domestic violence, when irrelevant to the charge at hand, has "great potential to incite unfair prejudice." United States v. Hands, 184 F.3d 1322, 1328 (11th Cir. 1999). In Hands, where the defendant faced narcotics charges, we concluded that

7

evidence of domestic abuse should have been excluded both for irrelevance and for unfair prejudice under Rule 403. Id. at 1329 (noting that spousal abuse is "particularly likely to incite the jury to an irrational decision [especially where the testimony and evidence were] graphic and arresting").

Hands is distinguishable. Evidence of domestic violence is unfair propensity evidence in an ordinary narcotics case. But in a murder for hire case like this one, where the defendant wanted his girlfriend dead to keep her from testifying about his pistol-waving assault on her, evidence of the key abusive episode is a critical part of the story. It has significant probative value, and any prejudice flowing from it is not "unfair." See Fed. R. Evid. 403; United States v. Merrill, 513 F.3d 1293, 1301 (11th Cir. 2008) (noting that Rule 403 is "an extraordinary remedy which should be used only sparingly") (quotation marks omitted).

**B.**

Second, Covington contends that the government presented insufficient evidence to prove the element of 'use of interstate facilities' under 18 U.S.C. § 1958. The statute provides that whoever "travels in or causes another . . . to travel in interstate or foreign commerce, or uses or causes another . . . to use the mail or any facility of interstate or foreign commerce, with intent that a murder be

committed [for payment]" violates 18 U.S.C. § 1958(a). The telephone system is clearly a "facility of interstate . . . commerce." 18 U.S.C. § 1958(b); see also United States v. Drury, 396 F.3d 1303, 1311–12 (11th Cir. 2005). Covington does not dispute that but argues that it is not "use" of an interstate facility to *receive* a phone call from out of state, which he did. He cites by analogy Watson v. United States, 552 U.S. __, 128 S. Ct. 579, 581 (2007), which held that receiving a firearm in a drug transaction is not "using" a gun.

The Watson opinion instructs that, in interpreting the term "use," we should look to its "ordinary or natural meaning." 128 S. Ct. at 581 (quotation marks omitted). In keeping with that instruction, the Court has established that trading a gun for drugs is "use" of a gun, Smith v. United States, 508 U.S. 223, 228–30, 113 S. Ct. 2050, 2053–55 (1993), but simple possession of a gun during a drug deal is not "use" of it, Bailey v. United States, 516 U.S. 137, 143, 116 S. Ct. 501, 506 (1995), and receiving a gun in exchange for drugs is not "use" of the gun either, Watson, 128 S. Ct. at 581. The basic premise is that "use" of an object requires the "active employment" of that object by the defendant. Id. (emphasis omitted).

Answering a telephone and conversing on it is "active employment" of the telephone. As the FBI's recordings show, Covington actively employed the phone to convey information, including the details of the crime and how much cocaine

9

would be paid to the intended hit man, who was located four states away in Virginia.

Covington argues that even if he "used" the phone, he did so only because the FBI's informant set him up by intentionally calling him from out of state. Covington asserts that kind of set up was not permitted in United States v. Coates, 949 F.2d 104 (4th Cir. 1991). In the Coates case an undercover detective who lived in the same state as Coates crossed a state line to place a phone call to Coates just to gain federal jurisdiction. Id. at 105–06. The Fourth Circuit reversed Coates' conviction, adopting the view that "federal jurisdiction in criminal prosecutions should not be recognized when patently contrived by means adopted solely for the purpose of creating a federal crime." Id. at 106.

Covington's analogy to Coates will not work. This case would be similar to Coates only if Towner, the FBI's informant, had lived in Florida, like Covington, and had driven to another state in order to call Covington solely to manufacture federal jurisdiction. But here the informant Towner lived in Virginia, and was solicited repeatedly in Virginia by one of Covington's co-conspirators before Towner even became an informant. An interstate scheme was underway in this case well before the FBI got involved. The FBI did not contrive to make the phone calls in order to manufacture the interstate element as was the case in

10

Coates, but only collected more and better evidence of the crime. Covington's "use" of the phone system is sufficient to satisfy the interstate facilities element under 18 U.S.C. § 1958.

Not only that, but there were also plenty of other interstate facilities that Covington used and plenty of activities that crossed state lines. Covington originally hired Wes, who did not live in Covington's home state of Florida, to kill Cotto. It also appears that Covington "caused" Towner to travel from Virginia to Florida, and that Covington "caused" his co-conspirator Pumpkin to send a postal money order from West Virginia to Towner in Virginia.

## C.

Third, Covington contends that the government presented insufficient evidence of any payment to, or of an agreement to pay, anyone for the murder. 18 U.S.C. § 1958(a) requires the government to show "intent that a murder be committed . . . as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value . . . ." See also United States v. Hernandez, 141 F.3d 1042, 1057 (11th Cir. 1998) (explaining that the statute "undeniably contemplates a quid-pro-quo (or at least the promise of such) between the parties to the transaction, the murderer and the solicitor").

Covington argues that nowhere in the recorded phone conversations did he promise to pay Towner anything for the murder, either in drugs or money. He also characterizes the government's evidence of his possible future payment as "limited and inconclusive," says that the amount of drugs to be paid varied widely from half a kilo to six kilos of cocaine, and asserts that Towner never actually received any money or drugs.

The evidence proved that Towner received a $300 money order from Pumpkin, the wife of the man to whom Covington admitted he sent $300 to the hit man. Covington referred to the $300 in a recorded phone conversation in which he told Towner that he "shot them three up there." That $300 eventually reached Towner through Pumpkin after Covington, in another recorded phone conversation, said: "[d]on't make me come to Virginia to get my shit." FBI agent Rivera, who interviewed Covington after his arrest and Miranda warnings, testified that Covington told him that he had sent $300 to Pumpkin's husband Wes to pay for the hit man's travel to Florida.

Agent Rivera also testified that Covington told him he had paid Wes half a kilo of cocaine for killing Cotto. Towner corroborated Covington's confession by confirming that he first expected to be paid $5,000 for the murder, but that over time the negotiations focused on kilos of cocaine. Towner testified that near the

12

end of the conspiracy he and Covington had discussed six kilos of cocaine, valued at between $90,000 and $150,000, as the price for the murder.

Viewing the evidence in the light most favorable to the government, see United States v. Ortiz, 318 F.3d 1030, 1036 (11th Cir. 2003), the record—including Covington's own confession—shows that from day one Covington tried to contract for the murder of Cotto using money and cocaine. Plenty of evidence supports the consideration element of § 1958.

## III.

Having rejected all of Covington's challenges to his convictions, we turn to his three attacks on his forty-year sentence.

## A.

First, Covington contends that the district court erred when it applied the ACCA, 18 U.S.C. § 924(e)(1), in sentencing him. Covington argues that one of his three predicate offenses, specifically his conviction for battery in a detention facility in 1991, was constitutionally invalid. Although admitting that he pleaded guilty to that offense, he claims he had ineffective counsel and was absent from his own plea colloquy in that case.

Two separate problems doom Covington's argument. First, neither a claim that predicate conviction counsel was ineffective nor a claim that the guilty plea

13

leading to that conviction was not knowing and intelligent is cognizable under §

924(e).[2] <u>Custis v. United States</u>, 511 U.S. 485, 496, 114 S. Ct. 1732, 1738 (1994)

(rejecting Custis' claims that his predicate offenses involved ineffective assistance

of counsel and lacked a knowing and intelligent guilty plea as inappropriate

attempts to gain federal review of state court convictions through § 924(e)).

Moreover, Covington pleaded guilty to Count 3 of his superseding

indictment in this case. Count 3 alleged that he had possessed a firearm in

violation of § 922(g)(1); it listed his three prior felonies for armed possession of

cocaine, battery in a detention facility, and robbery; and it alleged that he qualified

for ACCA, § 924(e)(1). Covington's knowing and informed plea of guilty to

Count 3, which included a plea colloquy that addressed the ACCA and its possible

penalties, amounted to an express admission that § 924(e)(1) applied to his case.

See <u>United States v. Moore</u>, 425 F.2d 1290, 1291 (5th Cir. 1970) ("A plea of

guilty knowingly and understandingly made is an admission of all facts alleged in

the indictment or information . . . .");[3] <u>United States v. Bennett</u>, 472 F.3d 825, 833

---

[2] Complete *denial* of counsel is cognizable under <u>Custis</u>, <u>see</u> 511 U.S. at 496, 114 S. Ct. at 1738, but Covington does not deny that he had counsel in the 1991 battery case, and the district court found that Covington was present at the plea hearing before his conviction in that case.

[3] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (<u>en banc</u>), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

14

(11th Cir. 2006) ("After the district judge's thorough instructions, Bennett admitted that he had been convicted of three prior violent felonies [because they were alleged in the indictment and discussed at the plea colloquy]. This alone authorized the district court to sentence Bennett as an armed career criminal under § 924(e)."). The facts here are virtually identical to those in the <u>Bennett</u> case. Under that decision, as well as <u>Custis</u>, Covington's challenge to his ACCA-enhanced sentence is meritless.

**B.**

Second, Covington contends that the district court improperly grouped his three convictions. After Covington pleaded guilty to Count 3, the felon in possession charge with the ACCA penalty, he was tried and found guilty of Counts 1 and 2, the murder for hire and conspiracy charges under 18 U.S.C. § 1958. The district court did group Counts 1 and 2 for sentencing purposes, but it considered Count 3 to be a separate group. Covington argues that this grouping was improper under U.S.S.G. § 3D1 and that it resulted in a base offense level of 37 rather than 36. That difference allegedly converted his applicable guidelines range from 324 to 405 months into 360 months to life.

Section 3D1.2 states that counts "involving substantially the same harm" must be grouped together. U.S.S.G. § 3D1.2. Subsection 3D1.2(b) specifies that

the phrase "substantially the same harm" covers counts that "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." Id. § 3D1.2(b).

Counts 1 and 2 involved Covington's scheme to hire a hit man to murder his ex-girlfriend Cotto. That conduct by Covington occurred in March 2006. The hiring of the hit man and the conspiracy charge focused on the same victim and were part of a "common criminal objective" under § 3D1.2(b). That is why the district court grouped those two counts together.

But Count 3 was a simple felon in possession charge stemming from a domestic violence dispute in October 2005 in which Covington threatened Cotto with a pistol. To begin with, the murder for hire and possession charges do not appear to "involve the same victim" under § 3D1.2(b). The guidelines' commentary states that some offenses, such as drug and immigration offenses, have no identifiable victim and that in those cases society at large is considered the victim. U.S.S.G. § 3D1.2 n.2. Presumably, then, although Cotto was the intended victim in the murder for hire scheme, society as a whole was the "victim" of the firearm possession charge. By itself that distinction would prevent the district court from grouping Count 3 with the other two.

16

Even if Cotto had been the victim of both crimes, Count 3 did not share a "common criminal objective" with the other two counts. The motive for his murder for hire scheme was to keep Cotto from testifying about his assault on her in October 2005. There is no reason to believe that Covington wanted Cotto dead until *after* he got in trouble for the pistol-waving assault on her. From jail, Covington tried repeatedly to talk Cotto out of testifying against him. Unable to persuade her, he undertook a *new* criminal scheme five months later: her murder. The possession and the murder for hire were *not* part of the same plan or scheme, and they did not share the same criminal objective. The district court did not err in refusing to group all three of the counts together under U.S.S.G. § 3D1.2.

## C.

Third, Covington contends that the district court abused its discretion by sentencing him to forty years imprisonment. He argues that the court's evidentiary rulings show that it considered all three counts inextricably intertwined, and that makes it "manifestly unjust" to sentence him to a consecutive sentence of thirty years for Count 3 on top of the two ten-year concurrent sentences for Counts 1 and 2.

We review the district court's imposition of a consecutive sentence only for an abuse of discretion. United States v. Andrews, 330 F.3d 1305, 1307 (11th Cir.

17

2003). 18 U.S.C. § 3584(b) authorizes the district court to impose a consecutive sentence provided that it first considers the § 3553(a) factors. Once those factors are considered, the only limitation on running sentences consecutively is that the resulting total sentence must be reasonable, and ordinarily a sentence within the advisory guidelines range is reasonable. United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005). Covington bears the burden of demonstrating that his total sentence is unreasonable. See id.

Covington does not dispute that the district court considered the § 3553(a) factors in sentencing him. As the district court observed, a number of the § 3553(a) factors supported the imposition of a consecutive sentence. They include: Covington's violent criminal history, the seriousness of his murder for hire offenses, the need to promote respect for the law, his broad disregard for the safety of others, and evidence that he perjured himself during the trial. The resulting sentence totaled 480 months, which is within the 360 months-to-life range set by the guidelines.

Covington's sentence was reasonable, and the district court did not err in applying the ACCA, nor did it err in refusing to group Count 3 with Counts 1 and 2 under the sentencing guidelines.

**AFFIRMED.**