[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11366
Non-Argument Calendar
_____

D.C. Docket No. 8:15-cr-00507-VMC-MAP-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHRIS J. MCDONALD, SR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(December 4, 2018)

Before ED CARNES, Chief Judge, MARCUS, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Chris McDonald, Sr., participated in a conspiracy that involved depositing fraudulently obtained United States Treasury checks into his bank account. A jury convicted him of one count of conspiracy to commit theft of government funds and nine counts of theft of government funds, and the district court ordered him to pay restitution. McDonald appeals those convictions and the restitution order.

I.

In November 2011 McDonald joined a scheme to cash fraudulently obtained Treasury checks. That scheme began when, a few weeks earlier, Joseph Lugo agreed to cash Treasury checks for former Tampa Police Department corporal Jeanette Hevel, who stole them from the Department's evidence room. To avoid getting caught, Lugo asked a recent acquaintance of his, Robert Sanders, if Sanders could cash the checks or knew someone who could. Sanders, like Lugo, wanted the reward but not the risk. So he called McDonald, for whom he had previously done handyman work, and asked if McDonald wanted to cash the checks in exchange for a share of the proceeds. McDonald did. Lugo, Sanders, and McDonald agreed that each time Hevel gave Lugo a check, Lugo would give it to McDonald, who would deposit it into his bank account and withdraw the proceeds. Sanders would get five percent of those proceeds, McDonald would get between forty and forty-five percent, and Lugo would split the rest with Hevel.

2

In November and December 2011, McDonald deposited into his bank account nine fraudulently obtained Treasury checks that he received from Lugo totaling $64,924. But Lugo withdrew from the arrangement after McDonald told him that he deserved a larger share of the proceeds for his key role in the scheme. Without Lugo in the picture, Sanders and McDonald lost their check supplier.

Sanders and McDonald quickly devised a workaround. They decided to drive to various Tampa Bay neighborhoods and make offers to cash fraudulently obtained Treasury checks. The strategy worked. Sanders and McDonald got eight checks totaling $53,028.35, which McDonald deposited into his bank account in January and February 2012. Combined with the nine checks that he got from Lugo in 2011, McDonald deposited a total of seventeen checks totaling $117,952.35.

In December 2015 a federal grand jury indicted McDonald on ten counts: Count 1 for conspiracy to commit theft of government funds, in violation of 18 U.S.C. § 371, and Counts 2 through 10 for theft of government funds, in violation of 18 U.S.C. § 641. The bases of Counts 2 through 10 were McDonald's November and December 2011 deposits of the nine Treasury checks that he got from Lugo — one count per deposit. The indictment did not charge McDonald with making the January or February 2012 deposits.

At trial McDonald did not dispute that he had deposited the fraudulently obtained Treasury checks into his bank account. His defense, rather, was mistake

3

of fact:  He contended that he was unaware that the nine checks that he got from Lugo in 2011 were fraudulently obtained because Lugo and Sanders had tricked him into believing that they were legitimate.

To undercut that defense, the government introduced McDonald's bank account records, which showed that he deposited the nine checks that he got from Lugo in 2011 and the eight checks that he got with Sanders after Lugo stopped supplying checks.  The government also had a financial investigator from the Department of Justice testify about a spreadsheet she had created that detailed McDonald's banking activity from November 2011 to February 2012.  The spreadsheet showed, among other things, that McDonald deposited into his bank account seventeen checks totaling $117,952.35; that he withdrew the funds by using the same methods; the name of the taxpayer who was expecting the check; and the check's amount, its number, and its deposit date.  And the government had Sanders testify about how he and McDonald drove to various Tampa Bay neighborhoods to solicit fraudulently obtained Treasury checks within two days of their falling out with Lugo.  The district court admitted all of that evidence after finding that it was inextricably intertwined with the charged offenses, but it provided a limiting instruction to the jury.

Sanders also testified about how McDonald knew that the checks he received from Lugo in 2011 had been fraudulently obtained.  He recounted that

4

when he told McDonald that the checks were "fraudulent return checks," McDonald responded: "That's not a problem. We need to make some money." Sanders also testified that McDonald had falsely told the branch manager of his bank that the checks belonged to disabled clients whose houses he was renovating.[1]

The jury convicted McDonald on all ten counts, and the district court sentenced him to twelve months and one day in prison, varying downward from a guidelines range of twenty-one to twenty-seven months in prison. The district court also entered a restitution order against McDonald in the amount of $117,952.35, the total amount of the seventeen fraudulently obtained checks that he deposited from November 2011 to February 2012. He appeals his convictions and the restitution order.

## II.

McDonald contends that the district court abused its discretion and violated Federal Rule of Evidence 404(b) when it admitted the documentary and testimonial evidence related to the eight Treasury checks that he deposited into his bank account in 2012. McDonald argues that this evidence — the records of his 2012 banking activity, and Sanders' and the DOJ financial investigator's testimony

---

[1] The district court also admitted a host of other evidence, including testimony of some of the taxpayer victims, testimony of a Florida state financial specialist explaining that McDonald was not licensed to operate a check-cashing business in Florida, and testimony from Hevel describing the conspiracy.

5

about that activity — was inadmissible because it was pure propensity evidence. We review the district court's decision to admit that evidence "only for a clear abuse of discretion." United States v. Covington, 565 F.3d 1336, 1341 (11th Cir. 2009) (quotation marks omitted).

Rule 404(b) states that while "evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," the "evidence may be admissible for another purpose, such as proving . . . intent." Fed. R. Evid. 404(b). But "Rule 404(b) does not exclude evidence that is 'inextricably intertwined' with evidence of the charged offense." United States v. McNair, 605 F.3d 1152, 1203 (11th Cir. 2010). Evidence is inextricably intertwined if it "is linked in time and circumstances with the crime charged or . . . is an integral and natural part of the complete story of the crime." United States v. Horner, 853 F.3d 1201, 1213 (11th Cir. 2017).

The evidence related to the eight checks McDonald deposited in 2012 is inextricably intertwined with the offenses that the indictment charged him with. See United States v. Ford, 784 F.3d 1386, 1394 (11th Cir. 2015) (concluding that evidence related to uncharged conduct was inextricably intertwined with charged conduct because it "concerned fraudulent tax returns that were filed by [the defendant], during the same time period, and using the same methods"). The

challenged evidence shows that those checks are the same type of checks that McDonald was charged with depositing in 2011:  Treasury checks.  It shows that McDonald sought to obtain the checks that he deposited in 2012 only two days after his falling out with Lugo.  And it shows that McDonald not only deposited both sets of checks into the same bank account within weeks of each other, but that he also used the same methods to withdraw their proceeds.  So the temporal and circumstantial link between the evidence related to the eight checks that McDonald deposited in 2012 and the charged offenses is strong.   The evidence related to the eight checks that McDonald deposited in 2012 was also admissible to prove intent under Rule 404(b) because it refuted his defense that he did not intend to commit the charged offenses.  See United States v. Barrington, 648 F.3d 1178, 1186 (11th Cir. 2011).  The district court did not abuse its discretion by admitting the evidence.[2]

III.

McDonald also contends that the government failed to present sufficient evidence at trial to support his convictions for nine counts of theft of government

---

[2] McDonald also contends that the district court should have excluded the evidence related to the 2012 checks under Rule 403 because its probative value was "substantially outweighed by the danger of unfair prejudice."   Fed. R. Evid. 403.  But "in cases where this Court has found other acts evidence inextricably intertwined with the crimes charged, the Court has refused to find that the evidence should nonetheless be excluded as unduly prejudicial." United States v. McNair, 605 F.3d 1152, 1206 (11th Cir. 2010).  And the evidence related to the 2012 checks is much more probative of his intent to commit the charged theft offenses than it is prejudicial.  The district court did not abuse its discretion by refusing to use the "extraordinary remedy" of Rule 403 exclusion.  Covington, 565 F.3d at 1343 (quotation marks omitted).

7

funds under § 641.  He argues that the evidence did not show that he intended to steal funds from the government by depositing the fraudulently obtained Treasury checks into his bank account because he was not "aware that the checks were not 'good.'"

"We review de novo the sufficiency of the evidence presented at trial, and we will not disturb a guilty verdict unless, given the evidence in the record, no trier of fact could have found guilt beyond a reasonable doubt."  United States v. White, 663 F.3d 1207, 1213 (11th Cir. 2011) (quotation marks omitted).  When we review the sufficiency of the evidence, "we look at the record in the light most favorable to the verdict and draw all reasonable inferences and resolve all questions of credibility in its favor."  United States v. Hill, 643 F.3d 807, 856 (11th Cir. 2011) (quotation marks omitted).

To convict McDonald for theft of government funds, the government had to prove beyond a reasonable doubt that:  "(1) the money described in the indictment belonged to the United States or an agency thereof; (2) [he] appropriated the property to his own use; and (3) [he] did so knowingly with intent to deprive the government of the money."  United States v. Wilson, 788 F.3d 1298, 1309 (11th Cir. 2015).  McDonald challenges only the third element, which requires proof that McDonald "had knowledge of the facts, though not necessarily the law, that made the taking a conversion."  Id. (quotation marks omitted).

8

The evidence was more than sufficient to allow a reasonable jury to find that McDonald knowingly stole government funds.  Sanders testified that McDonald knew that the Treasury checks that Lugo gave McDonald in 2011 were fraudulently obtained and that McDonald fabricated a story to the bank manager to avoid getting caught.  See White, 663 F.3d at 1214 ("[T]he extent to which the parties . . . conceal their bribes is powerful evidence of their corrupt intent.") (quotation marks omitted).  McDonald sought out and deposited fraudulently obtained Treasury checks, and he agreed to a forty-five percent cut for cashing those checks.  Plenty of evidence supports the intent element of § 641.

IV.

McDonald also challenges the district court's decision to order him to pay restitution in the amount of $117,952.35, a decision that we review only for an abuse of discretion.  Cani v. United States, 331 F.3d 1210, 1212 (11th Cir. 2003).  In his brief he states that the district "court specifically identified [him] and his case number" in the amended forfeiture order that it entered against Lugo "as being subject to [its] determination that restitution was being capped" at $88,504.71.  So, McDonald contends, the district court abused its discretion by ordering him to pay $117,952.35 in restitution instead of $88,504.71.

McDonald's contention rests on an erroneous reading of the amended forfeiture order that the district court entered against Lugo and the conflation of

9

forfeiture and restitution. The forfeiture order entered in Lugo's case states, in relevant part, that Lugo "shall be held liable for an order of forfeiture in the amount of $20,000. The United States shall not collect more than $88,504.71, in total, from [Lugo] and any co-conspirators sentenced for the same offense in United States v. Hevel, . . . United States v. McDonald, . . . and United States v. Sanders. . . ."[3] That order, which is titled "**AMENDED ORDER OF FORFEITURE**," caps the amount of money that the government can collect from McDonald and his co-conspirators by way of forfeiture, which is a penalty. It does not speak to restitution. See United States v. Joseph, 743 F.3d 1350, 1354 (11th Cir. 2014) ("While restitution seeks to make victims whole by reimbursing them for their losses, forfeiture is meant to punish the defendant by transferring his ill-gotten gains to the United States Department of Justice (DOJ)."). The amended forfeiture order does not, contrary to McDonald's contention, render the district court's decision to enter a restitution order against him that exceeds $88,504.71 an abuse of discretion.

    **AFFIRMED.**

---

[3] $88,504.71 is the sum of the thirteen checks that Hevel stole from the Tampa Police Department. McDonald deposited nine of those checks, which totaled $64,924. The district court entered a forfeiture order in that amount against McDonald. He does not challenge that order on appeal.

10