[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 23, 2010
JOHN LEY
CLERK

No. 08-16912

_____

D. C. Docket No. 07-80187-CR-DMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GREGORY CLAUDE BROWN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 23, 2010)

Before BIRCH and MARCUS, Circuit Judges, and HODGES,* District Judge.

PER CURIAM:

_____

* Honorable Wm. Terrell Hodges, United States District Judge for the Middle District of
Florida, sitting by designation.

Defendant-appellant Gregory Claude Brown ("Brown") appeals his conviction and sentence for conspiracy to commit mail and wire fraud, failure to timely file income tax returns, and tax evasion. He argues that the district court erred by allowing him to represent himself, improperly commenting on his right to represent himself, admitting evidence of prior convictions and bad acts, and imposing the statutory maximum sentence. We find that the district court did not err and AFFIRM.

## I. BACKGROUND

Brown moved to Florida in the late 1990s and became involved with Emy Delmonaco ("Delmonaco"). R5 at 158-60. They had a daughter in 2001. R5 at 166; R18 at 2768-69. Brown sold mobile homes, opened a nightclub, and, eventually, decided to acquire, renovate, and resell houses. R5 at 159-62; R18 at 2768-70. Because of his limited resources, he conducted transactions in Delmonaco's name, using her credit and her bank accounts, and concocted false income statements and assets, misrepresenting their residential intentions and financial liabilities. R5 at 168, 172, 178-79, 185-89, 193-98, 215, 222-25, 228-31, 236-41, 246-47; R18 at 2770-71. Delmonaco acknowledged that Brown completed at least one mortgage application and misrepresented her employer, her position at the employer, the balance in her bank account, additional income from

2

rents, an employer letter and bonus, and her annual earnings as indicated on a W-2 form. R5 at 193-98. Through these endeavors, he procured financing, and, during 2000-01, purchased five residential tracts based upon fraudulent mortgage applications. R5 at 173; R18 at 2770-73. The mortgages were structured with seller's concessions for repairs on the distressed homes so that Brown and Delmonaco received cash back at the closings. R5 at 170, 208-09. They used the cash that they received not only for the needed repairs but also for living expenses and to purchase additional properties. Id. at 169, 176-77, 185-86, 194, 214, 222-23. After Brown and Delmonaco separated in 2002, Delmonaco obtained a court order for $1,000 per month child support. Id. at 178-79; R6 at 291-92. Brown satisfied that and other obligations from his real estate transaction proceeds and profits but filed no income tax returns. R18 at 2665.

Through his real estate transactions, Brown met Nick DeAngelis ("DeAngelis"), who operated a company named "Giasi" and also engaged in fraud and tax evasion. Id. at 2776-80. In 2003, Brown established Global Dynamics Consulting ("GDC") and also began working for Giasi. R5 at 256. At Giasi, he received a salary and sales commissions but did not report these earning to the IRS. R2 at 1954-56; R5 at 256.

DeAngelis' and Brown's activities were investigated by federal agents.

3

Brown was charged with knowingly and willfully making a false statement on a loan application and creating false earning statements and W-2 wage and tax statements for Delmonaco. R6 at 338-39. He negotiated a guilty plea and his cooperation against DeAngelis was made known to the district judge. R19 at 2966-68. Brown testified against DeAngelis in three separate proceedings, and was subsequently sentenced to time served, three years supervised release, and 100 hours of community service. R6 at 339, 366-67; R19 at 2958, 2968. After Brown, however, failed to file his delinquent tax returns, actively concealed his business activities from his probation officer, Janet Guthrie ("Guthrie"), and falsely claimed to have completed his community service, his supervised release was revoked. R10 at 1214-25; R11 at 1237-1306; R19 at 2961-62.

Following his release from custody, Brown began a number of speculative ventures using his own funds and funds he obtained from business acquaintances, family, and friends: stock investments, casino ownership, acquiring and reselling raw diamonds, and land purchases. R11 at 1444-45; R14 at 1911; R18 at 2693, 2834-35, 2856-57; R19 at 2899.

Brown became involved with Monica Martinez ("Martinez") and they had a daughter in 2004. R6 at 296. That same year, Brown and Martinez leased with an option to purchase property at 326 Kenilworth Boulevard, West Palm Beach,

4

Florida ("Kenilworth"). Id. at 463-64, 472-74. After taking possession, however, Brown failed to make rental payments and began extensive renovations contrary to the rental agreement and without the landlord's permission. Id. at 474-80. To avoid eviction for these acts, Brown exercised his option to purchase and acquired the property in April 2004 with $329,000 in mortgage financing provided by his landlord. Id. at 484-90.

Brown failed to make his mortgage payments and foreclosure proceedings commended in July 2004. Id. at 492. To avoid foreclosure, Brown sold the property to Martinez for $550,000. Id. at 496, 498-500. Martinez's application for mortgage financing was submitted by mortgage broker Kimball Johnson. R9 at 819-22. In the application, Martinez falsely stated that she was the owner of GDC, and had worked for GDC for two years earning $20,000 per month. Id. at 835-36, 1016. Brown's accountant, Terry Forman, provided false verification for Martinez's employment. Id. at 1016. Brown composed a letter purportedly from a contractor inaccurately detailing improvements to the property to justify the increase in value. R7 at 686-88. The application was granted by an out-of-state lender who wire transferred the proceeds to Martinez's account.[1] R9 at 835-36.

---

[1] In 2005, Brown was again unable to make his mortgage payments and sold the property for $718,000 to a buyer recommended by mortgage broker Brent Woodson. R7 at 745; R9 at 780, 784-85, 1000-01. The buyer was assured by Brown that he would lease the property back from the buyer after the sale for an amount to cover the mortgage payments. R7 at 746, 748; R9

Brown next purchased a residence at 186 Yale Circle, Lake Worth, Florida ("Yale"). R10 at 1068-69. He initially portrayed the buyer as his stepfather who was mis-identified as the well-paid owner of GDC. Id. at 1056, 1059-61. Before the closing, however, Brown substituted himself as the buyer and, working with mortgage broker Brent Woodson ("Woodson"), submitted a request for $430,000 for mortgage financing. Id. at 1079. Brown falsely claimed that he had been employed for ten years by GDC where he received a significant salary, and that the property, which was uninhabitable at that time, would be his primary residence. Id. at 1079-80; R19 at 2914. He submitted verification of long-term rental payments made to Martinez, omitted his child support payments from his application, and detailed $60,000 due to contractor Tony Piedra for work done on the property.[2] Id. at 2916. This loan was financed by an out-of-state wire transfer.[3]

During the spring of 2005, Brown bought three more properties: 311 Greenwood Drive, West Palm Beach, Florida ("Greenwood"); 2409 Zeder Ave., Delray Beach, Florida ("Zeder"); and 245 Fordham Drive, Lake Worth, Florida

at 794-97. Brown, who represented himself as the property owner, also agreed to covertly cover the down payment. R7 at 746, 750, 757; R9 at 800, 1003. After the property was sold, Brown made no rental payments and the property was foreclosed. R7 at 760-65, 770; R9 at 783.

[2] At closing, a check was issued for $60,000 to Piedra who immediately endorsed it and used it to finance the down payment. R7 at 690-97; R19 at 2916-17.

[3] Brown subsequently refinanced the property twice but was never able to obtain the necessary permits to make the property habitable. R19 at 2918. It was eventually foreclosed.

("Fordham"). Delmonaco served as a real estate agent on all three properties,[4] Woodson handled the mortgage applications for the Greenwood and Zeder properties, and Brown's half-brother, Joseph F. Farmer ("Farmer"), handled the Fordham mortgage application. R6 at 299-300, 303-16, 318, 320-21, 323-24, 327, 328-36; R10 at 1085-86, 1095-96; R19 at 2918-20, 2922, 2924-25. Each application was submitted to a different lender and did not disclose the other pending financing requests. R9 at 858-60. In both the Greenwood and Fordham applications, Brown claimed that the properties would be his primary residence and he submitted fictitious leases to offset the mortgage obligations which were acknowledged. R9 at 852, 860-66; R19 at 2919. In each of the applications, Brown falsely stated that he had been employed by GDC for ten years and failed to disclose his child support payments. R6 at 311-12, 322-23, 326-27; R9 at 850-51, 855-56. All of the applications were granted and funded by out-of-state lenders who wire transferred the loan proceeds to the respective closings. R11 at 1387, 1400; R12 at 1689, 1692-94; R14 at 1993, 1995, 2000.

In January 2006, Delmonaco, as Brown's real estate agent, and Brown contracted to sell the Greenwood property to Anthony Parks ("Parks"). R6 at 330; R19 at 2919-20. When Delmonaco learned that Brown and Parks had agreed to

---

[4] By then, Delmonaco had obtained her real estate license. R6 at 304.

inflate the sales price with Brown promising to remit the excess mortgage proceeds to Parks, she cautioned Brown that the arrangement was fraudulent and declined further involvement. R6 at 333-35; R19 at 2920. She was concerned about Brown proceeding with the transaction, because she believed that he was on federal probation for mortgage fraud. Id. at 338. Brown claimed that the transaction had been approved by his probation officer, persisted in the arrangement, pocketed the additional mortgage proceeds, and refused to share them with Parks. R6 at 340; R19 at 2922.

In 2005, Brown applied for and obtained a mortgage loan for a property at 799 W. Silverdale Road, Queen Creek, Arizona, using Farmer as his broker. R12 at 1671-72, 1680-81. In the application, Brown acknowledged his mortgage obligations on the Fordham, Greenwood, Yale, and Zeder properties, but showed false rental agreements on them. Id. at 1677, 1682-84. He falsely indicated that he had no dependents, paid no child support, and had a monthly income of $30,000 per month. Id. at 1674, 1677-78. Once the loan was granted, the proceeds were wire-transferred to Brown from out of state. Id. at 1681-82.

About the same time, Brown persuaded Jorge Suarez ("Suarez") to sell him Suarez's home located at 2714 Fairway Cove, West Palm Beach, Florida and to invest $100,000 in one of Brown's diamond ventures. R14 at 1911-13. Suarez

8

planned to lease the property from Brown, and to buy it back after a profit was realized from the diamond investment. Id. at 1915-16. Brown obtained the mortgage loan and the proceeds were wire transferred from an out-of-state lender.[5] Id. at 1912.

In late 2005, Brown convinced Wilfredo Martinez ("Wilfredo"), Monica Martinez's father and a former sugar mill worker, to invest $100,000 in Brown's diamond venture. R11 at 1437, 1444. Wilfredo raised the money by mortgaging his residence on Coconut Drive and giving the equity to Brown. Id. at 1444-45. The diamond venture failed in February 2006. R19 at 2898-99. Brown promised to repay Wilfredo through his purchase of a property located at 4607 Arlette Court, Lake Worth, Florida. R11 at 1445-50. Using Farmer as the mortgage broker, Wilfredo applied for a loan that included misrepresentations as to his employment history and income. Id. at 1457-59, 1470-72, 1474-77, 1480. In the application, Wilfredo was stated to have been a "regional representative" for GDC for five and one-half years, and to earn $11,500 per month. Id. at 1457; R12 at 1498. In actuality, Wilfredo had worked for GDC as a handyman for one and one-half years. R11 at 1457. The financing was provided by an out-of-state wire transfer.

Brown also assisted Wilfredo with the refinancing of a property located at

---

[5] Brown defaulted on the loan, and the property was foreclosed. R14 at 1933-35.

109 Paradise Harbor Drive, North Palm Beach, Florida. R12 at 1499-1501.

Farmer served as the mortgage broker, and the mortgage application set forth the same misrepresentations as to Wilfredo's employment history and income. Id. at 1477, 1480, 1499-1501. The mortgage financing was approved and provided by an out-of-state wire transfer. Id. at 1491, 1501.

In the spring of 2006, Brown applied for financing by separate applications through Farmer to purchase two luxury condominiums at "The Lofts," 108 Lake Avenue, Lake Worth, Florida. Id. at 1573, 1576, 1582, 1608, 1610. Each condominium cost over one-half million dollars. Id. at 1580. In each application, Brown indicated that the respective unit would be his primary residence and failed to list other pending mortgage loan applications or his child support payments. Id. at 1580, 1583, 1610-12. Brown indicated that his monthly income was $40,000 on one application and $76,000 per month in another. Id. at 1590, 1599. Both loan applications were granted, and the loan proceeds were wire transferred or mailed.[6] Id. at 1625, 1632.

Brown was indicted, with others,[7] for conspiring to commit or having committed fraud, in violation of 18 U.S.C. § 1349, 1343, and 1341, in the

---

[6] Brown's properties at The Lofts subsequently were foreclosed. R2-220, Exh. "Loss for Brown;" R12 at 1637.

[7] Co-indictees were Martinez and Wilfredo. Both entered guilty pleas before Brown's trial. R11 at 1438-39.

disclosing allegedly false and fictitious mortgage applications and associated documents relating to multiple residential properties in Florida and Arizona. R1-104. The government claimed that on the applications for almost every property, Brown had: stated that the property was his primary residence and that he had been self-employed through GDC for ten, instead of two, years; submitted false documentation that the properties were leased; submitted false verifications for employment for Martinez and others; failed to disclose ownership of various properties; simultaneously submitted and failed to disclose the submission of multiple mortgage applications to separate financial institutions; omitted his child support obligation; claimed false rental income from properties he owned; inflated his personal income; obtained false documentation from to corroborate his and Martinez's employment and income; and obtained and submitted false letters detailing improvements to properties to justify an increase in value. The government also alleged that he failed to timely file his tax returns from 2001 through 20005, in violation of 26 U.S.C. § 7203, and lied to about doing so. The government charged that Brown evaded taxes from 1998 through 2005, in violation of 26 U.S.C. § 7201, by using Delmonaco's checking account and attributing his income, mortgage interest payments, and sales profits to her, and by having Martinez open a bank account for Brown's benefit with his funds in her

11

name.  Following arraignment, Assistant Federal Public Defender Samuel Smargon ("Smargon") was appointed to represent Brown.

Prior to trial, the United States formally notified Brown of its intent to introduce evidence of his prior fraudulent mortgage fraud to demonstrate knowledge, intent, and the lack of accident or mistake.  R1-118 at 1-2.  It claimed that the earlier offenses were inextricably intertwined with the charged offenses, especially the tax charges since Brown's earned income from his former acts constituted unreported or evaded income.  Id. at 2-4.  It advised that Brown's probation officer would testify regarding the false information that he had provided to her.  Id. at 2.  Smargon opposed the government's motion but noted that Brown planned to testify and that the evidence could then be used.  R3 at 6-7; R5 at 116-17, 122-23.  After observing that Brown's false statements could be used for impeachment, the district court asked the government to explain how they planned to use the evidence.  Id. at 118.  The government responded that the evidence showed his knowledge of the truthfulness required on a mortgage loan application and his intent to obtain mortgages by making false statements, and his evasion of taxes.  Id. at 117-18, 121-22.  The district court denied the motion *in limine* but noted that Brown could offer specific objections.  Id. at 123-24.

During the opening statements, Smargon set forth the theory of defense.  He

12

explained that Brown's alleged mortgage application misrepresentations were not intentional but were, instead, immaterial and inadvertent mistakes, resulting from Brown's disorganized and numerous endeavors in purchasing fifteen homes. R5 at 142-48. He also suggested to the jury that Brown's failure to file his taxes was based on his lack of income and his understanding that he was not required to do so due to his financial losses. Id. at 147-51.

Delmonaco testified about the earlier mortgage frauds and her concern for Brown's continued efforts to seek a mortgage that she understood might be fraudulent. R5 at 189, 193-98, 203, 221-23, 228-31, 234-39, 242-43, 245-47; R6 at 336-40. When the government sought to question Delmonaco about monies that Brown had received during the earlier mortgage fraud transactions, Smargon objected that the questions were "outside of the scope of the indictment" and asked for a sidebar. Id. at 169. The district court replied that the sidebar was "not necessary" and overruled the objection. Id.

The government introduced a transcript of Brown's testimony before a grand jury. Id. at 251-52. Smargon stated that he had "a continuing objection to th[e] entire line of questioning," but no specific objection to the admission of the transcript. Id. at 252. He then clarified that the continuing objection was as to all of Delmonaco's testimony. Id. The district court admitted the transcript over

13

objection.  Id.  At the government's request, Delmonaco to read Brown's testimony regarding the income that he received from Giasi in 2001.  Id. at 253-54.

Delmonaco testified about her work as a real estate agent with Brown on transactions involved in the charged offenses. R6 at 299-338.  She explained that, after she became concerned that at least one of the transactions constituted mortgage fraud, she removed herself from the transaction and contacted Brown regarding her concerns because she knew that he was on probation.  Id. at 333-36, 338, 340.  Brown advised her that he had "check[ed] in with his probation office and his accountant . . . regarding moneys owed or earned, and he had it cleared," and felt that he was "perfectly safe."  Id. at 341-42.

The government  asked Delmonaco to read from the transcript of Brown's 2004 deposition in a civil matter.  Id. at 385-87.  Smargon's objection that the deposition transcript was "irrelevant, immaterial" was overruled.  Id. at 385.  Delmonaco read from the deposition in which Brown explained that he had been convicted of bank fraud because he had "filled out a credit application for [Delmonaco] falsifying information" to assist her in obtaining a mortgage on property that they were purchasing together.  Id. at 387.  He referred to her as his "ex-mortgage broker," and admitted that her income was misrepresented.  Id. at 387-88.  When asked about the truth of these statements, Delmonaco responded

14

that she had not been Brown's mortgage broker and that Brown had not disclosed that he had falsified W-2 forms.  Id. at 388-89.

Just after Guthrie, Brown's probation officer, began testifying, Smargon renewed his objection to the "entire line of questioning" and, specifically, to the areas discussed in the motion *in limine*.  R10 at 1212.  The district judge advised that he should object if the government ask any questions that involved those areas.  Id.  After the government moved for the admission of a document in which Brown requested permission to travel outside of the United States, Smargon objected and renewed his "continuing objection on this entire line of questioning."  Id. at 1216.  He stated that his objection to the evidence was that it was "irrelevant, immaterial, prejudic[ial], outside the scope of these charges."  Id. at 1216-17.  The objection was overruled.  Id. at 1217.  Guthrie explained that Brown did not check with her or show her the sales contracts for mortgages that he was transacting, but that she learned about them by checking the public records.  Id. at 1221.  She stated that she had neither approved nor disapproved any real estate purchases for Brown.  Id. at 1221-22.  Guthrie testified that, despite her instructions and his agreement to do so, Brown failed to provide her with required documentation or itineraries for some of his travel or with  documentation of some of his bank accounts and financial transactions.  R10 at 1214, 1216-18, 1220; R11 at 1234-37, 1241, 1243-48, 1288-

15

95, 1298. Brown also agreed to file his taxes for the tax years 1998 through 2003 and confirmed to her that he had done so when he had not. R11 at 1250, 1253-54, 1264-65.

On the second day of trial, Smargon advised the district court that he was having "bad pains in [his] left leg," was very uncomfortable, and was awaiting a phone call from his surgeon. R6 at 269-70. He explained that he had surgery about three months prior and had been fine until the weekend before the trial. Id. at 269. He said that he experienced "bad pains in his leg" from noon through the evening on the first day of trial but was doing fine on the second day. Id. at 269-70. On the third day of trial, he advised the district judge that he had been fine on the second day "until 2:30 [P.M.] and then [the pain] was really severe last night." R7 at 532. He explained that he had talked to the doctor, been prescribed steroids, and was "fine." Id.

Smargon also advised the district judge that he had received computerized discovery the day before and a folder of discovery that morning that he had not yet read. Id. at 532. He commented that, because he had received discovery during the two weeks before trial, it had been "very difficult" to prepare for trial and to read all of the discovery. Id. When the government responded that it was providing the discovery as soon as it was received, Smargon replied that the

16

disclosure at such a late date was "outrageous." Id. at 534. He stated that he did not have the two to four hours that it would take to review the review the discovery, and additional time to review it with Brown. Id. at 533. When the district court adjourned for lunch, Smargon asked if the courtroom could be locked so that he and Brown could review some of the documentation. Id. at 649. Smargon explained that such review was a "nightmare" due to Brown's detention and the limitations placed on Smargon during visitations.[8] Id. At the district court's request for accommodations, Smargon and Brown were allowed to confer for thirty minutes in the courtroom. Id. at 650.

On the fourth day of trial, Smargon notified the district court that Brown desired to assist him in questioning the government's witnesses. R9 at 846. He explained that they were "not see[ing] eye to eye on how to question the[] witnesses" and that he had explained to Brown that it would be the district court's decision as to whether Brown could participate. Id. at 846-47. Brown stated that he "understood every document" and that Smargon had been unable to review the documents because of his back surgery and other commitments. Id. at 847. He explained that he understood that he needed legal advice but that he felt that he

---

[8] Smargon explained that Brown was unable to see the documents that Smargon was referencing in their discussions because Smargon was "not allowed to bring paperwork into the [jail visitation] room." R7 at 649.

could "get to the information" in the documents.  Id.  The district court responded that Brown was "represented by counsel" and that both he and Smargon could not question the witnesses.  Id. at 848.  The district court explained:

> [E]ither you represent yourself or you have counsel. . . . I'm not going to permit you both to question witnesses.  If you want to represent yourself, that may not be the wisest decision, but if you want to I need to do an inquiry and determine whether you're capable of doing it, because you have a right to do that if you want to.
> On the other hand, if you're represented by counsel you need to work with your lawyer and your lawyer's got to represent you.  So those are really the two choices.  You can try to communicate with him. . . . it's natural that some disagreements might come up from time to time.  He does have the legal knowledge sometimes to make judgments in a different way than you're likely to.
> . . .
> If you want to do it, decide – I'll conduct the inquiry and we'll go that route.

Id.  When the district judge subsequently asked what Brown wanted to do, Brown responded that he would "leave it alone."  Id. at 849.  Later, the district judge commented that he wanted "to make sure I give your inquiry or – the time it deserves because as you point out, it is significant.  This issue of counsel, I want to make sure I've fully covered this with you."  Id. at 899.  The district judge then explained that the issue had been covered in Faretta v. California, 422 U.S. 806, 95 S. Ct. 2525 (1975), in which the Supreme Court "decided that people basically have a right to represent themselves."  Id.  The district judge then quoted Faretta:

18

'It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly. To force a lawyer on a defendant can only lead him to believe that the law contrives against him.

Moreover, it is not inconceivable that in some rare instances[,] the defendant might[] in fact[] present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant and not his lawyer or the State[,] will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense[] ultimately to his own detriment, his choice must be honored out of respect for the individual[,] which is the life blood of the law.'

The Court went on to say, 'When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason[,] in order to represent himself, the accused must knowingly and intelligently forego those relinquished benefits. Although a defendant need not himself have the skill and experience of a lawyer in order to competently and intelligently choose self representation, he should be made aware of the dangers and disadvantages of self[-] representation[,] so that the record will establish that he knows what he is doing and his choice is made with eyes open.'

So basically the Court says you can do it, but places some duty on trial judges to make sure somebody does it knowingly and intelligently.

Id. at 899-901 (quoting Faretta, 422 U.S. at 834-35, 95 S. Ct. at 2540-41 (citations

omitted)). The district judge then referenced the Faretta dissents for "reasons for

the pitfalls" of self-representation. Id. at 901. He explained that they believed that,

because defendants were "better off . . . to have lawyers", "someone could be

19

required to accept representation because otherwise they were basically committing suicide." Id. at 901-02. He then again quoted from Faretta:

> 'The fact . . . is that in all but an extraordinarily small number of cases[] an accused will lose whatever defense he may have if he undertakes to conduct the trial himself.' . . .
>
> 'Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with a crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel[] he may be put on trial without a proper charge[,] and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissable.
>
> []He lacks both the skill and knowledge adequately to prepare his defense, even though he may have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he may not be guilty, he faces the danger of conviction because he does not know how to establish his innocence.' . . .
>
> 'If there is any truth to the old proverb that one who is his own lawyer has a fool for a client, the Court . . . now bestows a constitutional right on one to make a fool of himself.'

Id. at 902-903 (quoting Faretta, 422 U.S. at 838-39, 852, 95 S. Ct. at 2543, 2550 (internal citations omitted)). The district judge stated that he wanted to insure that Brown knew the pitfalls and that he had a right to represent himself and needed to "figure it out." Id. at 903. He noted that Brown's choices were to (1) continue with Smargon's representation and questioning of the witnesses with Brown consulting and assisting Smargon in crafting questions or (2) to represent himself. Id. The district judge advised that, if Brown chose to represent himself, he would

"direct" Smargon to stay to advise and help Brown, but that Brown would "be in charge." Id. Brown then asked if he would be permitted to recall witnesses if he took over his defense. Id. at 903-04. The district judge replied that he could call witnesses who were "available" and could be present "with reasonable notice" and could obtain advice from counsel as to how to accomplish that. Id.

On the fifth day of trial, Smargon advised the district court that during the following week he would be receiving an epidural for pain relief because, although he was doing fine during the morning, the pain was starting about 3-4:00 P.M. and continuing through the evening. R10 at 1028-29. He explained that he could be in court by 10:00 A.M. if all went well. Id. at 1029. The district court commented that it would "accommodate [Smargon's] back problem," and that it would explain the problem to the jury because Smargon had "been standing up some" so that they did not think he was "just roaming around." Id. at 1030-31. Before the jury was dismissed that day, the district judge advised the jury that trial would start at 10:00 A.M. on the next trial day because Smargon was "having some back problems" and that they may have noticed him "standing a couple of times." Id. at 1227.

Before trial began on the next day, Smargon advised the district court that Brown had not yet decided to continue with Smargon's representation or to represent himself and was continuing to think about it. R11 at 1317. He explained

21

that Brown was directing him to do things that Smargon did not want to do or put his name on.  Id.  Ex parte, Smargon explained that Brown wanted to recall seven witnesses who had been called on direct and call other witnesses who had not yet been called, all of whom Smargon would not call because the government could then cross-examine them and "hammer [Brown] even worse than they already have."  Id. at 1318.  He also opined that one of the other witnesses was "clearly irrelevant" and he would not feel comfortable putting on two other witnesses "at this point because of the nature of their evidence."  Id.  He said that he was "very uncomfortable" signing subpoenas for witnesses that he did not intend to use.  Id.  After the district court advised Smargon and Brown to decide what steps they were going to take, Brown stated that "at some point", he would:

> take over the defense, that's for sure.  No doubt about it.  I know each of these witnesses.  I know each one of these documents.  I know what signatures are forged. . . .
> . . . Now that I have had time to go over [the 25 boxes of documentary evidence], I know that I can impeach every one of these witnesses.
> . . .
> Without a doubt, I will take over my defense once it starts.  After I take the – what I'm teetering on now is whether I go on the stand and Mr. Smargon question[s] me or whether I put myself on the stand.  Either way, I'm taking – I don't have a choice. In a case like this, I've got to take the stand in order to prove my innocence so I'm taking the stand.  Whether I do that on my own or have Mr. Smargon do that first, at whatever point, the point that I'm off that stand, I am then taking over the defense.
> . . .

22

I said it from day one or from our last conversation that I want to do this. I know that I – if I lose and go to jail now – I'm going to jail as it is right now period. There is no doubt about it. If I take over my own case and I still go to jail, what have I lost?

Id. at 1320-21.

When the district court requested that Brown clarify whether he would "definitely" represent himself, Brown responded that he was "taking over [his] own case," and wanted to start after the government finished its case. Id. at 1322-23. The district court then queried Brown on his education, mental health, and capability to "assume the duties of self-representation." Id. at 1323-24. Brown answered that he had "[f]inished high school," had no history of mental illness, and would be able to introduce evidence and question witnesses with assistance from Smargon. Id. at 1323-25. The district court explained that Brown would be responsible for his own testimony and for making a final argument. Id. at 1324. When the district court observed that Brown would not be able to file an ineffective assistance of counsel claim, Brown responded that he did not believe they would "get to that point" and that Smargon had not "done a bad job" but did not know the 25 boxes of documentary evidence. Id. at 1325-26. Following the lunch recess, Smargon expressed his frustration about not being able to meet with Brown to review the 23 boxes of discovery. Id. at 1327. He explained that Brown was unable to review the documents because Smargon was unable to carry the

discovery boxes due to his back and Brown's detention prevented his review of the documents.  Id. at 1327-28.  He stated that "[t]he only time that Mr. Brown has a chance to look at the boxes is when he is in the courtroom . . . while the evidence is going on, and obviously, he needs to talk to me."  Id. at 1327.

Before Brown took over his defense, Smargon advised the district court that he needed time to help Brown prepare but he did not want to do it that day because he needed to go home because he was "very, very tired."  R12 at 1732.  He said that he "really d[id not] feel good."  Id. at 1734.

Just before the government's last witness, and outside the presence of the jury, the parties discussed how Brown's case would proceed.  R14 at 2018-21.  Smargon explained that Brown would take over after the government rested.  Id. at 2020.  The government asked whether the district court would "be putting anything additional on the record – the [g]overnment is concerned about making sure we're clear on the record. . . . the [district c]ourt has gone through extensive colloquy."  Id.  The district court judge responded that it had covered Brown's education and mental status, "observed [Brown] during the trial being quite attentive and writing many notes to his lawyer," and commented that "while he doesn't have legal training, [Brown is] a bright guy who is – while I've advised him in my judgment

it's a bad decision, I think he's able to do it under the case law."[9]  Id.  When the district court asked whether there was "any additional inquiry" needed, the government asked that the district court include the inquiry in the record and that it not be sealed but neither the government nor Smargon made any additional suggestions regarding the inquiry.  Id. at 2020-21.  The district court judge reminded the parties that Smargon would be available to advise Brown, and Brown clarified that he understood that, once he took over, there would be no "flip-flopping" and that he would be responsible for the closing.  Id. at 2021.

At the conclusion of the government's case, the district court again inquired as to whether Brown was "certain" that he wished to take over his defense, and Brown responded "I'm certain."  R15 at 2162-63.  The district court reminded Brown that he would be held to the same rules as a lawyer,  that Smargon would stay to "advise" Brown, and that Brown would be responsible for questioning the witnesses and handling any objections.  Id. at 2163-64.  With the government's agreement, the district court explained to Brown that his testimony would be as a narrative direct.  Id. at 2165.  The district court judge then advised the jury that Brown had chosen to represent himself, and addressed the Faretta requirements and

---

[9]  At that point, witnesses had testified as to Brown's familiarity with court proceedings. Brown had testified once before a federal grand jury and three times during a federal criminal trial, had been prosecuted in federal court, had been the defendant in a paternity suit, and had filed at least one civil lawsuit.  R6 at 291-92, 363-67; R7 at 730-32; R10 at 1210-11.

25

their responsibilities toward Brown in his various roles.[10] Id. at 2169-71.

Specifically, the district judge advised the jury that Brown had chosen to avail

---

[10] The district court advised the jury as follows:

Mr. Brown has advised that he wishes to assume handling of his defense. In other words, he intends to represent himself from this point forward. And he has the right to do that. I've advised him the risk to that course of action. But he, knowing the risk, wants to go forward, and the Supreme Court has ruled that he has that right.

What the Court said . . . it is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But the Court goes on to say, it is not inconceivable that in some rare instances the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant and not his lawyer or the State will be bear the personal consequences of the conviction. It is the defendant therefore who must be free personally to decide whether in his particular case counsel is to his advantage.

And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of that respect for the individual, which is the life blood of the law.

Now, I've asked Mr. Smargon to stay so he is available to Mr. Brown for advice but he won't be handling the defense. Mr. Brown will be. And so that presents some issues for you and I because it's important for both of us to not use sympathy and prejudice in deciding the case. So we've got to hold the Government and the defendant to the same rules. I can't lean over backwards to help him. I can't give him advice on how to do it. I've got to apply the same rules to both.

In doing that I'll try to explain the basis for it, to the degree I can. But you also need to make sure you separate his role as representing himself from his role as a witness.

He's told me he is likely to testify in this case. As I told you at the beginning, what the lawyers say is not evidence. It's only the evidence that comes in from witnesses and documents that can be considered. So when Mr. Brown is asking questions or presenting argument, he's acting as a lawyer. That's not evidence and can't be considered by you as evidence. If Mr. Brown takes the stand and is under oath and testifies, that's evidence. And that's the only thing you can consider.

So you'll need to focus a little bit more on that dichotomy of rules than we usually do when we have a lawyer representing a defendant.

R15 at 2169-71.

26

himself of his legal right to represent himself and was doing so despite "knowing the risk" that he would "bear the personal consequences of the conviction and might "conduct his own defense ultimately to his own detriment." R15 at 2169-70. The court also advised the jury that Smargon would remain to assist Brown, and that it should be aware of Brown's role as counsel and as a potential witness. R15 at 2170-71. No objections were made to the district court's jury instruction.

Brown then recalled and examined four government witnesses: Delmonaco, mortgage brokers Johnson and Woodson, and accountant Forman. R15 at 2171; R16 at 2398, 2522; R18 at 2623. Forman testified that Brown was concerned about filing returns and paying his unpaid taxes. R18 at 2628, 2629, 2632-34, 2638-41, 2645-54, 2656-66. Forman also explained that he advised Brown there were no criminal consequences for non-payment of taxes, that Brown believed he should not file his taxes until he had the money to pay them, and that Brown believed he had no duty to file income tax returns for certain years because of his financial losses. Id. at 2629, 2632-34, 2638-41, 2653-54, 2664.

Brown took the stand and testified. He explained that the misstatements in the loan applications were inadvertent and immaterial, and that the mortgage brokers had authored the misrepresentations and had forged his signature. R18 at 2813-15, 2830-31, 2833-34, 2841, 2843-44; R19 at 2883, 2912-13, 2916-17, 2919,

27

2924-25, 2927-32, 2935. He contrasted the documents from his earlier fraud convictions with the documents for the charged offenses, and asserted that he would not have authored such obvious deceptions. R15 at 2195-97, 2211-12. He alleged that his earned income was dwarfed by business losses, and that he did not believe that he needed to file tax returns. R18 at 2794-96, 2811-12, 2817-22, 2827, 2831-32, 2842-43, 2846-47.

In explaining closing arguments to the jury, the district court observed that Brown had "done an admirable job in trying to deal with the [procedural and evidentiary] rules." R20 at 3075. The government addressed Brown's prior conviction during its rebuttal closing argument and focused on his credibility. It stated that:

> [Brown has] been convicted before of doing the exact same thing, mortgage fraud. But when it comes to this case, [he claims] it wasn't me.
> . . .
> He knows how to get properties when you don't have any income, when you don't have a real job. He did it in 2000 and 2001, and he did it again in this case.
> . . .
> When you ask a liar a question, what kind of an answer do you think you're going to get? And we all know Mr. Brown's a liar. He's been convicted of it. We all know he lied to his probation officer. We all know now he went to jail for it. . . .
> From what you've seen here, he can't make accurate statement on anything. Not even his own community service.
> Now, Mr. Brown has indicated over and over again that he didn't have the intent to defraud anybody in this case

28

. . .

[but he] intentionally tried to mislead you.

. . .

[T]he evidence in this case clearly shows that [Brown] is a con man. He is a liar. He is a convicted liar. He's lied to you on numerous occasions. He committed the acts in this case and the only verdict . . . that's just in this case is guilty.

Id. at 3192-93, 3197, 3201. The district court instructed the jury on good faith reliance on an accountant. R19 at 3059; R20 at 3223-24.

The jury returned a verdict of guilty on all 18 counts. R2-187; R20 at 3235-38. The district court then asked Brown whether he wished to proceed with sentencing pro se or represented by Smargon. R20 at 3239. Brown responded that he wanted Smargon to represent him. Id. at 3239-40. After Smargon observed that Brown "[o]bviously, . . . was dissatisfied" with his representation, the district court commented that Brown had "never expressed dissatisfaction with [Smargon's] representation . . . [b]ut . . . chose to step forward for reasons he stated" and that Smargon would be re-appointed as counsel. Id. at 3240-41

The probation officer recommended a guideline range of 292-365 months of imprisonment, an offense level of 38, and a criminal history category of III; Brown, through attorney Arthur Wallace ("Wallace"), objected in writing and at sentencing.[11] R2-223: R21 at 2, 6-10, 16-29, 42-47, 50-53, 54-60, 62, 65, 67-79,

_____

[11] Following the trial, Smargon requested a hearing regarding counsel's status and Brown moved pro se to remove Smargon and for the appointment of substitute counsel. R2-190,

81. At sentencing, the district court stated that it had reviewed the presentence investigation report ("PSI"), the PSI addenda, Brown's objections, the government's response to Brown's objections, an affidavit, and some letters, including one from a juror recommending that Brown "receive a lengthy sentence." Id. at 2-3. The district court also commented that the juror's letter and recommendation was not isolated and that

> the entire jury expressed their view . . . after the trial that they . . . thought . . . Brown deserved a harsh sentence and – they were not impressed with his presentation at trial. Particularly the fact that . . . he was very good at fraud, and that . . . some aspects of this fraud were beneath him. That if he was doing it, it would be a lot better fraud was essentially the argument he presented to the jury.
> . . .
> I advised him against doing it. He chose to do it. He actually did the presentation pretty well, but the point was what he was saying was not helpful to his case. And he chose not to listen to his lawyer.

Id. at 5-6. The district court overruled eight of Brown's objections, but granted the objections as to the reduction of the criminal history points. Id. at 41, 49-50, 54, 59-60, 65-66, 73, 81. The court found that the crimes were serious, there was a need to protect the public from Brown's behavior, he committed the crimes while

---

192. The district court granted the motions and appointed substitute counsel for Brown. Id. at 194. Due to a conflict of interest with the first substitute counsel, attorney Arthur Wallace was later appointed to represent Brown. Id. at 195, 198, 199. In the meantime, Brown moved pro se for a new trial, filed a notice of governmental misconduct, and requested dismissal of the proceedings. Id. at 193, 202. The district court denied the motion for new trial without prejudice. Id. at 213. Brown's substitute appointed counsel filed a renewed motion for new trial and a motion for mistrial which the district court denied. Id. at 230, 231; R21 at 5.

on supervised release for another similar federal offense, Brown showed no remorse, did show arrogance, and victimized his family and friends. Id. at 93. Brown was subsequently sentenced to imprisonment terms of 240 months on Counts 1-2, 12 months on Counts 13-17, and 60 months on Count 18 to run concurrently; supervised release for three years on Counts 1-12 and 18, and one year on Counts 13-17 to run concurrently; assessed $1,325.00; and ordered to pay $2,079,867.83 in restitution.[12]  R2 at 235; R21 at 93-95.

Brown filed a notice of appeal and a corrected notice of appeal. R2-236, 237. Because the corrected notice of appeal was late, we remanded for the limited purpose of a determination of excusable neglect or good cause. R2-259 at 2. Brown's motion for extension of time to appeal was granted. R2-261, 262. On appeal, Wallace was permitted to withdraw; Brown is currently represented by retained counsel Michael Metz.

## II.  DISCUSSION

1. *Brown's Self-representation*

Brown argues that the district court should not have permitted him to represent himself because doing so after the government had rested its complex case was untimely. He also maintains that the district court failed to conduct an

---

[12]  Brown was remanded into custody and is currently incarcerated. R2-235 at 2.

adequate <u>Faretta</u> inquiry; that, due to his attorney's medical issues, the waiver of counsel was not intelligently, knowingly, and voluntarily made; and that it was clear that Brown's proposed defense would not succeed. He contends that the district court failed to inquire about his concerns regarding Smargon's medical problems and how it affected his performance and advice regarding self-representation.

We review the mixed question of law and fact of whether a defendant voluntarily and knowingly waived his Sixth Amendment right to counsel <u>de</u> <u>novo</u>; the government bears burden of proving the validity of the waiver. <u>United States v. Garey</u>, 540 F.3d 1253, 1268 (11th Cir. 2008) (<u>en</u> <u>banc</u>). The importance of the defendant's intelligent, knowing, and voluntary waiver removes the review from a harmless error analysis. <u>See</u> <u>United States v. Fant</u>, 890 F.2d 408, 410 (11th Cir. 1989) (per curiam).

The right of a criminal defendant "to be represented by counsel is among the most fundamental of rights" because "lawyers in criminal courts are necessities, not luxuries." <u>Penson v. Ohio</u>, 488 U.S. 75, 84, 109 S. Ct. 346, 352 (1988) (quotation marks and citation omitted). A criminal defendant does not, however, have a right to a specific lawyer or the right to demand a different lawyer absent good cause. <u>Garey</u>, 540 F.3d at 1263. Good cause for the appointment of

32

substitute counsel requires the showing of a fundamental problem which could lead to an apparently unjust verdict.  Id.  Such a fundamental problem could be shown by a complete breakdown in communication between the defendant and his attorney, a conflict of interest, or an irreconcilable conflict.  Id.  Absent such a showing, a defendant who lacks the means to hire a private attorney must either accept the appointed attorney or represent himself.  Id. at 1263-64.

It is through criminal counsel that a defendant's rights are protected and it "affects his ability to assert any other rights he may have."  Penson, 488 U.S. at 84, 109 S. Ct. at 352 (quotation marks and citation omitted).  Because of the importance of counsel, a  defendant cannot waive his right to counsel and assert his right to represent himself without "knowingly and intelligently for[egoing] those relinquished benefits."  Faretta, 422 U.S. at 835, 95 S. Ct. at 2541 (quotation marks and citation omitted).  "[I]n the context of [such a] waiver, 'knowing' is synonymous with 'intelligent' and 'voluntary' is synonymous with 'competent' and 'intentional.'"  Jones v. Walker, 540 F.3d 1277, 1287 n.4 (11th Cir. 2008) (en banc).   The defendant must be informed "of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open."  Faretta, 422 U.S. at 835, 95 S. Ct. at 2541 (quotation marks and citation omitted).  The trial court must conduct a searching,

and not just summary, inquiry to establish the defendant's understanding. Fant, 890 F.2d at 409. Further, although the "ideal" setting for the inquiry is during a pretrial hearing, it is not required, United States v. Cash, 47 F.3d 1083, 1088 (11th Cir. 1995), and, in rare cases, a defendant's actions or statements in the record may provide sufficient evidence to establish a knowing and intelligent waiver of counsel and election to proceed pro se, Fant, 890 F.2d at 409. See also Garey, 540 F.3d at 1268-69 (observing that a defendant's voluntary waiver and knowledge may be demonstrated by an affirmatively invocation or the defendant's conduct in rejecting all other available options and responses to the district court's warnings and questions).

"The closer to trial an accused waiver of the right to counsel is, the more rigorous, searching and formal the questioning of the trial judge should be."[13] Cash, 47 F.3d at 1088 (quotation marks and citation omitted). The ultimate test is not, however, based on the district court's advice or questioning, but is based on the defendant's understanding of the risks of self-representation and free choice to

---

[13] Once "meaningful trial proceedings have commenced," "the defendant forfeits the unqualified right to proceed pro se" and a district court may deny such a request as untimely. United States v. Young, 287 F.3d 1352, 1354 (11th Cir. 2002) (quotation marks and citation omitted). Further, the right to self-representation is not absolute and may be denied if the defendant is incapable of maintaining the dignity of the courtroom, complying with the relevant rules, procedures, and laws, or engaging in obstructive or serious misconduct, and stand-by counsel may be appointed to assist a defendant, even over the defendant's objection. See Indiana v. Edwards, 554 U.S. __, __, 128 S. Ct. 2379, 2384 (2008) (citations omitted).

face those risks. <u>Strozier v. Newsome</u>, 926 F.2d 1100, 1105 (11th Cir. 1991). The information that the defendant must possess to make an intelligent waiver will be case-specific facts and circumstances. <u>Iowa v. Tovar</u>, 541 U.S. 77, 88, 92, 541 U.S. 1379, 1387, 1392 (2004).

The inquiry must include questions directed to the defendant that ensure his intelligent, knowing, and voluntary waiver of his right. <u>Faretta</u>, 422 U.S. at 835, 95 S. Ct. at 2541. It may include questions regarding his age; educational background; physical and mental health; his legal experience, including that in any criminal trials; his contact with lawyers prior to the trial; his knowledge of the nature of the charges, and possible defenses and penalties; his understanding of the rules of courtroom decorum, evidence, and procedure; whether the waiver resulted from coercion or mistreatment; and whether the defendant was trying to manipulate the events of the trial.[14] <u>Id.</u>; <u>Fitzpatrick v. Wainwright</u>, 800 F.2d 1057, 1065-67 (11th Cir. 1986). Although a district court's warning of the dangers of self-representation and recommendation against it is not enough, it is not necessary that all of the factors for determining whether the defendant knowingly and intelligently waived his right point toward waiver. <u>Id.</u> at 1065; <u>Strozier</u>, 926 F.2d

---

[14] If a defendant wishes to proceed without counsel, it is recommended that a district court ask a defendant fifteen questions which include not only the areas mentioned above, but also whether he has studied law, previously represented himself in a criminal matter, has an understanding of the application of the Sentencing Guidelines, and is voluntarily waiving counsel. Fed. Jud. Ctr., <u>Benchbook for U.S. District Judges</u> §1.02 (4th. ed.) (2000).

at1105.

Brown's initial interest in representing himself and in waiving his right to counsel was not expressed to the district court pretrial or even before the jury was empaneled but only on the fourth day of trial, during the government's case. R9 at 847. When it initially surfaced, it was based on Brown's desire to assist his attorney in the questioning of the government's witnesses and his belief that he had a better grasp on the documentary evidence than Smargon. R9 at 846-47. At that time, Brown made it clear that it was not an impulsive decision but that he had thought about it for some time and had discussed it with Smargon. Id. at 846. When the issue of Brown's self-representation next arose, it was based again on his disagreement with his attorney's defense strategy and his belief that he could "impeach every one of these witnesses" because he knew the witnesses and the documents, and which signatures were forged. R11 at 1317-18, 1320. Other than Brown's comment that Smargon had been unable to review all of the documents because of his back surgery and other commitments, Brown expressed no concern about Smargon's health or his compulsion to take over his defense because of Smargon's health or its impact on Smargon's representation of him.

The district court did not pressure Brown for a quick and irrevocable decision, but read much of the warning language of Faretta to Brown, advised

36

Brown of the perils of self-representation on two separate days, and questioned him regarding his education and mental health. Brown responded that he was a high school graduate and neither suffered from nor had been hospitalized for mental illness. Brown's awareness of the penalty of at least one of the offenses was indicated by his comment that he was facing "about 20 years." R9 at 847. The district court advised Brown of the fact that "a lot of other people are also committing fraud" was not the best defense. Id. at 849.

The district court observed Brown during the trial as "quite attentive and writing many notes to his lawyer," and, although acknowledging that Brown had no legal training, as "bright," and had heard testimony of his prior legal experiences. R14 at 2020. The district court permitted Brown to represent himself but appointed Smargon as stand-by counsel to advise Brown on legal procedural and substantive matters. The district court heard from Smargon that Brown wished to question the government's witnesses because Smargon and Brown did not agree on the questioning and Brown was directing Smargon to act in ways that Smargon did not want to do. R9 at 846; R11 at 1317. The district court learned from Brown that he "understood" the documentary evidence that Smargon had been unable to review and felt that he could "impeach every one of these witnesses." R9 at 847; R11 at 1320.

37

Further, Brown's trial performance supported his waiver. He effectively summoned and questioned witnesses in support of his theory of defense. He questioned them coherently and sharply, and elicited few objections. He delivered an effective summation of the evidence in support of his defense.

Although Smargon advised the district court of his back pain and the treatment for it, he delivered an opening statement setting forth the initial theory of defense, comprehensively and effectively cross-examined the government witnesses, and demonstrated a thorough grasp of the complex documentary evidence. Brown advised the district court that he did not believe Smargon performed ineffectively and, later, not only complimented Smargon on his work but also requested Smargon's representation at sentencing. Smargon, as stand-by counsel, continued to work with Brown and Brown continued to seek his advice.

Brown's decision to represent himself was not based on his disillusionment with Smargon's representation but with his disagreement with him over strategy. Smargon did not wish to recall government witnesses; Brown wanted them recalled in order to confront them with misrepresentations on the loan documents. Brown believed that, as an actual participant in the events and as a signatory to many of the documents, he had a unique and better understanding of the transactions and the documents.

The district court did not abuse its discretion in accepting Brown's waiver of his right to counsel and in permitting him to represent himself.

2. *District Court Comments regarding Self-Representation*

Brown contends that the district court clearly erred by advising the jury that it had warned Brown against self-representation and by implying that the defense was not credible.

Because Brown's counsel failed to object, we review a district court's jury instructions regarding his right to self-representation for plain error. See United States v. Guerrero, 935 F.2d 189, 193 (11th Cir. 1991); United States v. Olano, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776 (1993). Plain error occurs when there is (1) an error, (2) that is plain, (3) that affects substantial rights and (4) which seriously affects the judicial proceeding's fairness, integrity or public reputation. Olano, 507 U.S. at 732, 113 S. Ct. at 1776. Clear comments regarding a defendant's decision to remain silent may constitute plain error that cannot be cured by a cautionary instruction. See United States v. Edwards, 576 F.2d 1152, 1154 (5th Cir. 1978) (per curiam). We will not reverse, however, unless our review of the jury instructions in their entirety, the presented evidence, and counsel's arguments reveal that the jury was misled and "manifest injustice" resulted. Autrey v. United States, 889 F.2d 973, 999 (11th Cir. 1989) (Clark, J., concurring in part and

39

dissenting in part). Further, where there is no explicit language in a rule or statute, or precedent from the Supreme Court or this court resolving an issue, there is no plain error. United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir. 2003) (per curiam).

A district judge is granted "wide discretion in managing the proceedings" within his courtroom and may "comment on the evidence," elicit or clarify facts, and interrupt counsel to maintain the pace of a trial. United States v. Day, 405 F.3d 1293, 1297 (11th Cir. 2005) (quotation marks and citation omitted). That discretion, however, does not include comments on the defendant's silence or jury instructions that such silence may be evidence of guilt. Griffin v. California, 380 U.S. 609, 615, 85 S. Ct. 1229, 1233 (1965). Further, the district judge's comments on the evidence must be made "with great care" because "juries are extremely sensitive to every word and intimation given by the judge." United States v. Jenkins, 901 F.2d 1075, 1083 (11th Cir. 1990) (brackets, quotation marks, and citation omitted). "What the jury may infer, given no help from the court, is one thing. What it may infer [from a district court's comments] is quite another." Davis v. United States, 357 F.2d 438, 441 (5th Cir. 1966).

Jury instructions are provided to give the jury "information to make the trial more meaningful" and "may be given, as the need arises, at appropriate points

during the trial." Fed. Jud. Ctr., <u>Benchbook for U.S. District Judges</u> § 2.07 (4th ed. 2000). Specifically, during a trial, when a defendant discharges his counsel and decides to proceed <u>pro se</u>, a district court may instruct the jury regarding this change in personnel. Fed. Jud. Ctr., <u>Pattern Crim. Jury Instructions</u> § 6 (1987).[15]

The district court's instruction provided the jury with such an instruction.[16]

---

[15] The suggested jury instruction reads:
> Even though ___ was at first represented by a lawyer, he has decided to continue this trial representing himself and not use the services of a lawyer. He has a perfect right to do that. His decision has no bearing on whether he is guilty or not guilty, and it should have no effect on your consideration of the case.

Fed. Jud. Ctr., <u>Pattern Crim. Jury Instructions</u> § 6. <u>See also</u> Third Cir., <u>Model Crim. Jury Instructions</u> §§ 1.18 ("Pro Se Defendant") and 2.35 ("Discharge of Defense Counsel During Trial") (2010).

The Third Circuit's instructions address not only the defendant's decision to proceed pro se and directs the jury to treat the defendant's "words spoken . . . while functioning as counsel . . . not . . . as evidence," but also the appointment of standby counsel. <u>Id.</u> Specifically, the instructions read:
> Even though (name of defendant) was represented by a lawyer when this trial began, (he) . . . has decided to continue the trial representing (himself) and not to use the services of a lawyer. (He) . . . has a constitutional right to do that. (His) . . . decision has no bearing on whether (he) . . . is guilty or not guilty, and it must not affect your consideration of the case.
>
> Because (name of defendant) has decided to act as (his) . . . own lawyer, you will hear (him) . . . speak at various times during the trial. (He) . . . may make . . . (a) closing argument. (He) . . . may ask question of witnesses, make objections, and argue to the court. I want to remind you that when (name of defendant) speaks in these parts of the trial (he) . . . is acting as a lawyer in the case, and (his) . . . words are not evidence. The only evidence in the case is the testimony of witnesses under oath exhibits admitted into evidence.

<u>Id.</u> at § 2.35 (italics omitted). The section addressing <u>pro se</u> representation provides similar language. <u>Id.</u> at § 1.18. Both sections also indicate that they are derived from Eighth Cir. § 2.22 and Fed. Judicial Cntr § 6.

[16] We have not adopted a pattern jury instruction addressing a defendant's conduct in representing himself or in discharging his counsel during a trial, <u>see</u> <u>generally</u> Eleventh Cir., <u>Pattern Jury Instructions (Crim. Cases)</u> (2003), and there is no case law setting forth an appropriate instruction.

It advised them that, after being advised of the risks, Brown had decided to represent himself for the remainder of the trial, that Smargon would remain as stand-by counsel, and that they should be mindful of the distinctions between Brown's role as counsel and his role as a witness. The instructions paralleled the instruction in circuits with a pattern instruction on the issue.

The district court committed no plain error in instructing the jury regarding Brown's decision to represent himself.

C. *Admission of Evidence Prior Convictions and Bad Acts*

Brown maintains that the district court erred in permitting the government to introduce evidence of his prior conviction, his probationary status, and his prior false statements, and in allowing the government to use the evidence in its closing argument.

We generally review a district court's admission of evidence of prior convictions or bad acts under Federal Rule of Evidence 404(b) for abuse of discretion, United States v. Ellisor, 522 F.3d 1255, 1267 (11th Cir. 2008), but review for plain error if no objection was made in the district court, United States v. Jernigan, 341 F.3d 1273, 1280 (11th Cir. 2003).

Although, generally, a motion *in limine* is not sufficient and a timely objection at trial is necessary to preserve an issue for review on appeal, United

States v. Gari, 572 F.3d 1352, 1356 n.2 (11th Cir. 2009), an *in limine* motion may preserve the issue "if a good reason exists not to make a timely objection at trial," Frederick v. Kirby Tankships, Inc., 205 F.3d 1277, 1285 (11th Cir. 2000) (citation omitted); see also Fed. R. Crim. P. 103(a)(1).

After the government advised that it planned to introduce evidence of Brown's prior convictions through the testimony of Delmonaco and Guthrie, Brown, through Smargon, responded with specific objections and moved *in limine* to prevent this testimony. The district court denied Brown's motion. During the trial, when Smargon objected to Delmonaco's testimony regarding Brown's prior offenses, the district court overruled that objection and indicted that it was not necessary to approach the bench to present additional grounds. Smargon made similar specific and continuing objections before Delmonaco and Guthrie testified about the prior offenses and Brown's prior bad acts, and again was overruled. Because the specific grounds for the objections were presented in the motion *in limine* and were understood by all parties when the objections were renewed at trial, the issue were preserved for review on appeal.

"Evidence of other crimes, wrongs, or acts is not admissable to prove the character of a person" or the defendant's propensity to commit a similar crime. Fed. R. Evid. 404(b); United States v. Covington, 565 F.3d 1336, 1341 (11th Cir.

43

2009). With proper notice from the prosecution of the general nature of the evidence that it plans to introduce, such evidence "'may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . ,'" Covington, 565 F.3d at 1341 (quoting Fed. R. Evid. 404(b)), and may be admissible if it is "inextricably intertwined with the evidence regarding the charged offense," United States v. Fortenberry, 971 F.2d 717, 721 (11th Cir. 1992) (citation omitted). Such intrinsic or otherwise admissable evidence maybe be excluded, however, "if its probative value 'is substantially outweighed by the danger of unfair prejudice.'" Id. (citing Fed. R. Evid. 403). "'[U]nfair prejudice', as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 519 U.S. 172, 180, 117 S. Ct. 644, 650 (1997) (citation omitted). "[E]vidence of the name or nature of a prior offense generally carries a risk of unfair prejudice" and that risk is "especially obvious" where the prior conviction was for a crime similar to the charged offense. Id. at 185, 117 S. Ct. at 652. Unfair prejudice may be increased when the evidence is the testimony of a parole or probation officer and courts are cautioned to admit such testimony in limited and necessary circumstances with appropriate safeguards. United States v. Pierce, 136

F.3d 770, 775-76 (11th Cir. 1998) (citations omitted). Further, evidence without a logical nexus to both the extrinsic and charged offenses lacks probative value on the defendant's state of mind and demonstrates only "inherently prejudicial" evidence of a defendant's bad character. See United States v. Dothard, 666 F.2d 498, 503, 505 (11th Cir. 1982). The question, however, is not merely whether the evidence is prejudicial but whether its probative value is outweighed by this prejudice; the "line . . . is thin" between permissible and unduly prejudicial evidence. Fortenberry, 971 F. 2d at 721 (quotation marks and citation omitted). The prejudicial effect of such evidence may be minimized by a limiting instruction from the district court. Id.

Evidence admitted under Rule 404(b) (1) "must be relevant to an issue other than the defendant's character," (2) the evidentiary act "must be established by sufficient proof to permit a jury finding that the defendant committed the extrinsic act," (3) "the probative value of the evidence must not be substantially outweighed by its undue prejudice," and (4) "the evidence must meet the other requirements of Rule 403." United States v. Matthews, 431 F.3d 1296, 1310-11 (11th Cir. 2005) (per curiam) (citation omitted). Further, the evidence must (1) "concern[] the context, motive, and set-up of the crime and [be] linked in time and circumstances with the charged crime," (2) "form[] an integral and natural part of the account of the crime," or (3) be "necessary to complete the story of the crime for the jury."

Covington, 565 F.3d at 1342 (quotation marks and citation omitted).

Extrinsic evidence of other similar crimes may be introduced to show that the charged offense did not result from an accident or mistake, but from intent. Jernigan, 341 F.3d at 1281-82; see United States v. Diaz-Lizaraza, 981 F.2d 1216, 1225 (11th Cir. 1993). In weighing the probative value against the unfair prejudice, a court "should consider the differences between the charged and extrinsic offenses, their temporal remoteness, and the government's need for the evidence to prove intent." Diaz-Lizaraza, 981 F.2d at 1225. We also review the similarity of the methodologies, including the manner and methods in which the extrinsic and charged offenses were conducted, for signs of a distinctive modus operandi. United States v. Clemons, 32 F.3d 1504, 1509 (11th Cir. 1994).

At trial, the government introduced the information, judgment, and sentence from Brown's 2004 conviction for making false statements on mortgage applications, testimony describing the actions that led to that conviction, and Brown's probationary status at the time of the charged offenses. Delmonaco testified that she knew of Brown's prior conviction and that, due to her concerns about statements made in documents related to one of the charged offenses, Brown told her that Guthrie and Forman had reviewed the documents. She explained Brown's use of nominees in the mortgage applications, the creation of false

46

documents, and arrangements for fraudulent verifications. Guthrie denied reviewing these documents and testified that Brown had made false statements to her about filing his income tax returns. The government also introduced Brown's grand jury testimony regarding his 2001 income and deposition testimony concerning his prior conviction.

The evidence of Brown's prior conviction for making false statements in mortgage fraud applications was properly introduced to establish his criminal intent and to rebut his claim that the misstatements were accidental or merely mistakes. Guthrie's testimony regarding the false statements that Brown gave her was introduced to show Brown's intent and knowledge of the impropriety of his actions. See United States v. Smolin, 182 F.2d 782, 786 (2nd Cir. 1950) ("[E]xculpatory statements . . . when shown to be false, are circumstantial evidence of guilty consciousness and have independent probative force.").

Further, any problem with the government's introduction of the evidence of Brown's prior conviction and of his truthfulness, or lack thereof, was mooted when Brown testified. All of the objected evidence was then available for impeachment purposes. See Fed. R. Evid. 608(b), 609(a)(1). Brown also discussed his prior conviction and false statements during his defense. He reviewed the acts leading to his conviction in his history and in his explanation of how he became involved in

47

real estate transactions and of how he went about financing the transactions.  The district court did not abuse its discretion in admitting this evidence.

D. *Substantive Reasonableness of Sentence*

Brown argues that the district court's imposition of the statutory maximum sentence was substantively unreasonable in light of the totality of the circumstances, including the 18 U.S.C. § 3553(a) factors.  He contends that the sentence is  inconsistent with the Sentencing Commission's goals of imposing the most severe sentences on repeat offenders and for the most severe crimes because the loss involved in his fraud offense totaled less than $2 million and was caused, in part, by the housing market crash.  He declares that the district court failed to adequately consider that his offenses were not violent in nature, that he was not a drug dealer, that he had no history of committing robberies, burglaries, or other crimes of that nature, and that he had always been a good father to his children.

In preparing a sentencing recommendation, the probation officer separated the offenses into two groups:  Group One for the fraud counts, (Counts 1-12) and Group Two for the tax evasion counts (Counts 13-18).  With respect to Group One, Brown was subject to a base offense level of 7, pursuant to U.S.S.G. § 2B1.1(a)(1), because the offense of conviction has a statutory maximum term of imprisonment of 20 years.  Brown's base offense level was increased by 16 levels, pursuant to

48

§ 2B1.1(b)(1)(I), because the offense involved a loss of more than $1,000,000 but not more than $2,500,000; two levels, pursuant to § 2B1.1(b)(2)(A)(i), because the offense involved 10 or more but less than 50 victims; two levels, pursuant to § 2B1.1(b)(9)(C), because the offense involved the use of sophisticated means; and an additional two levels, pursuant to § 2B1.1(b)(13)(A), because Brown derived more than $1,000,000 in gross receipts from financial institutions from the offense. Brown also received a four-level enhancement, pursuant to § 3B1.1(a), because he was an organizer or leader of the criminal activity; a two-level enhancement, pursuant to § 3C1.1, for obstruction of justice; and a three-level enhancement, pursuant to § 3C1.3, because he committed the instant offense while on bond release. Brown's adjusted offense level for Group One was 38.

With respect to Group Two, Brown was subject to a base offense level of 20, pursuant to § 2T1.1(a)(1)(H), because the tax loss was more than $400,000 but not more than $1,000,000. Brown received a two-level enhancement, pursuant to § 3B1.1(c), because he was an organizer, leader, manager, or supervisor of the criminal activity; and a three-level enhancement, pursuant to § 3C1.3, for committing the offense while on bond release. Thus, Brown's adjusted offense level for Group Two was 25. Application of § 3D1.4's multiple count adjustment resulted in a combined adjusted offense level and a total offense level of 38.

Brown received three criminal history points as a result of his prior offense, and an additional two criminal history points, pursuant to § 4A1.1(d), because he committed the present offenses while serving a term of supervised release. Based on his five criminal history points, Brown was placed in criminal history category III. Brown's total offense level of 38 combined with criminal history category III yielded a guideline imprisonment range of 292 to 365 months. Brown was also subject to statutory maximum penalties of imprisonment terms of 20 years with respect to Counts 1-12; 1 year with respect to Counts 13-17; and 5 years with respect to Count 18.

Prior to sentencing, Brown filed objections to the PSI. First, he objected to the loss amount set forth in the PSI, asserting that he should have received only a 14-level enhancement, instead of a 16-level enhancement with respect to the fraud counts, because the loss amount was between $400,000 and $1,000,000. R2-223 at 1. Also with respect to the fraud counts, Brown objected to the enhancements he received for (1) the involvement of more than ten victims, (2) the use of sophisticated means, (3) being a supervisor or manager of the offense, (4) obstruction of justice, and (5) committing the offense while on bond. Id. With respect to the tax evasion offenses, Brown objected to the two-level enhancement he received for his role in the offense and the three-level enhancement for

committing the offense while on bond release. Id. at 2. Brown also argued that he should not have received any criminal history points for a conviction that was over 10 years old. Id. Finally, Brown objected to the inclusion of certain prior offenses, for which he received no criminal history points, arguing that these offenses were committed by his brother. Id.

At the sentencing hearing, the district court noted that it had received a letter from a juror who believed that Brown "should receive a lengthy sentence." R21 at 3. The court also commented that the entire jury had informed the court, after trial, that Brown "deserved a harsh sentence and – they were not impressed with his presentation at trial," particularly Brown's argument that, if he had committed the fraud, he would have done a better job. Id. at 5-6. The court overruled Brown's objection to the government's fraud loss calculation, finding that the government's method of calculating the loss was a "conservative methodology." Id. at 26, 41. The court also overruled Brown's objections to the enhancements for (1) the involvement of ten or more victims, (2) the use of sophisticated means, and (3) Brown's role as a supervisor or manager of the offense. Id. at 49, 54, 59. The court sustained Brown's objection to the three-level enhancement under § 3C1.3 based on Brown committing the offenses while on bond release. Id. at 78, 92-93. Brown's total offense level was reduced by three levels, to level 35, and his guideline

imprisonment range was reduced to 210 to 262 months. Id. at 79. The court overruled Brown's objections to the two-level role enhancement with respect to the tax evasion counts, and to the one criminal history point that he received for a prior offense that he committed when he was 17 years old. Id. at 72-73, 80. Finally, the court overruled Brown's objection to the PSI's inclusion of prior offenses that he claimed were committed by his brother, because Brown did not receive criminal history points for these offenses and they did not affect the guideline calculations. Id. at 81.

The court determined that Brown was subject to a total offense level of 35, criminal history category III, and an advisory guideline range of 210 to 262 months. Id. The government recommended that the court sentence Brown to 262 months, at the top of the guideline range, because Brown had previously committed similar offenses, and he chose to continue violating the law to support his lifestyle, rather than obtaining a legitimate job. Id. at 82. It argued that Brown's activities caused Suarez's loss of his home, Zahlmann's bankruptcy, and Wilfredo's felony conviction. Id. at 83. It also noted that Brown's actions were detrimental to the properties that he owned and the neighborhoods where the properties were located. Id. at 83-84. The government contended that the court had a responsibility to deter conduct similar to Brown's, and maintained that Brown repeatedly lied to banks by

misstating his income and liabilities. Id. at 84. The government observed that Brown, while on supervised release, failed to comply with Guthrie's instructions to file his taxes and lied to her. Id. at 85. It opined that Brown "got a break" on his previous fraud convictions by being sentenced to time served. Id. Finally, the government contended that Brown presented an economic danger from which the court should protect the community by imposing a lengthy prison sentence. Id. at 86.

Brown argued that a sentence between 70 and 87 months would accomplish the goals of sentencing and that his offense conduct did not involve weapons, drugs, or violence. Id. at 89. He also argued that, during the time of his offense, "mortgage brokering activity was rampant," and he simply "made some bad investments." Id. at 90. Brown noted that there was collateral for his loans and that he used the loan money to purchase the houses he had promised to purchase. Id. at 90-91. Brown also argued that a large portion of the losses for which he was responsible resulted from the decline in the housing market. Id. at 91. Brown noted that he had two very young children and was "a very solid father to both of [his] children." Id. at 91-92. He argued that his "resources would be much better served doing some time and then getting back on the street," so that he could take care of his children and pay his restitution. Id. at 92.

Before imposing the sentence, the district court stated that it had considered the parties' arguments, the PSI, and the 18 U.S.C. § 3553(a) sentencing factors. Id. It adopted the PSI's findings and guideline calculations, with the exception of the three-level enhancement for committing the offense while on bond. Id. at 92-93. The court found that

> this is a serious crime. There is a need to protect the public because of [Brown's] repeated behavior. I find particularly critical the fact that he committed these crimes while on supervised release on another, with respect to another federal conviction for lying with respect to loan documents.
>
> During trial he showed no remorse and displayed an arrogance about his behavior. Mr. Brown also victimized family and friends in a particularly adverse fashion.

Id. at 93. After the court pronounced Brown's sentence, Brown renewed his prior objections. Id. at 95.

We may review a sentence for procedural or substantive reasonableness. Gall v. United States, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007). We review the substantive reasonableness of a sentence by considering the totality of the circumstances and, applying an abuse of discretion standard, we reverse only if we find that the district court has made "a clear error of judgment in weighing the § 3553(a) factors." United States v. Pugh, 515 F.3d 1179, 1191 (11th Cir. 2008) (quotation marks and citation omitted). The party challenging the sentence "bears

54

the burden of establishing that the sentence is unreasonable in the light of both th[e] record and the factors in section 3553(a)." United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005) (per curiam).

"[T]he district [court] should . . . consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." Gall, 552 U.S. at 49-50, 128 S. Ct. at 596. The factors in § 3553(a) that the court must consider are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims.

Talley, 431 F.3d at 786 (citing 18 U.S.C. § 3553(a)).

"[W]e may find that a district court has abused its considerable discretion if it has weighed the factors in a manner that demonstrably yields an unreasonable sentence." Pugh, 515 F.3d at 1191. Normally, however, the decision of how much weight to accord particular factors in devising a sentence is within the discretion of the district court. United States v. Clay, 483 F.3d 739, 743 (11th Cir. 2007).

In light of the § 3553(a) factors, Brown's 240-month sentence is substantively reasonable. The district court noted that Brown had committed the most recent offenses while on supervised release for another federal conviction for lying with respect to loan documents and that the most recent offenses involved numerous instances of the same conduct and lying to his probation officer. Based on Brown's prior failure to cease his participation in illegal activity, the district court reasonably determined that a lengthy term of incarceration was necessary for deterrence purposes. The district court also stated that it considered the offense to be serious in nature and that it needed to protect the public from Brown's repeated behavior. Although Brown argues that his offense did not involve weapons, drugs, or the use of force, his actions caused widespread harm to individual victims, banks, properties, and the neighborhoods in which his properties were located. The court adequately considered the nature and circumstances of Brown's offense, and the 240-month sentence Brown received was not substantively unreasonable in light of his repeated illegal conduct and the damage it caused. We affirm Brown's sentence.

### III. CONCLUSION

For the reasons stated, we AFFIRM Brown's conviction and sentence.